UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| THE GIL RAMIREZ GROUP, LLC, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 4:10-cv-4872 |
| HOUSTON INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Defendants. | § § | |

MEMORANDUM AND ORDER

Pending before the Court is the Motion to Dismiss and Original Answer to Plaintiffs' Fourth Amended Complaint ("Motion") (Doc. No. 196) of Defendants RHJ-JOC, Inc. ("RHJ") and Eva Jackson ("Jackson") (collectively "the RHJ Defendants"). After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the RHJ Defendants' Motion should be **GRANTED IN PART and DENIED IN PART.**

I.     BACKGROUND[1]

Plaintiffs The Gil Ramirez Group ("GRG") and Gil Ramirez, Jr. ("Ramirez") bring this suit against Houston Independent School District ("HISD"), Lawrence Marshall ("Marshall"), a member of HISD's board of trustees, several construction businesses, and various other affiliated individuals and entities. GRG is a commercial construction and repair business founded and principally owned by Ramirez. GRG and several of the defendants, including RHJ, compete for government construction contracts. The claims in this lawsuit arise out of alleged improprieties in the awarding of HISD's construction and repair contracts.

---

[1] The allegations contained in Plaintiffs' Fourth Amended Complaint are accepted as true for purposes of the pending motion.

Plaintiffs contend Marshall has a lengthy history of abusing his position as a member of HISD's board of trustees.  (Doc. No. 181, Fourth Am. Compl. ("Compl.") ¶ 17.)  In 1999, Marshall attempted to use his influence to assign all HISD employees who did not designate a primary physician to a physicians group called Peoples First, for which he served as a consultant, earning $25,000 per year.  (*Id.* ¶¶ 20–25.)  Marshall subsequently served as a consultant for another organization, Community Education Partners ("CEP"), from 2000 through 2003, during his time as a trustee.  (*Id.* ¶ 28.)  When HISD revised its ethics rules in 2004 to bar trustees from working for school district contractors, he recommended CEP hire his close friend and campaign treasurer, Joyce Moss Clay ("Clay").  (*Id.* ¶ 29.)  Since 2004, Marshall continued to receive a portion of the payments CEP made to Clay.  Marshall, along with others, also allegedly received inappropriate gifts from federally funded program vendors, causing HISD to lose millions of dollars of technology funding.  (*Id.* ¶ 30.)  One such vendor hired Clay as well, and Marshall also received a portion of the fees this vendor paid to Clay.  (*Id.* ¶ 31.)

The construction company defendants in this case also hired Clay as a consultant.  As early as 2003, the predecessor company to RHJ, a construction company, hired Clay to "provide moral support to Eva Jackson," who subsequently became the owner of RHJ.  (*Id.* ¶ 32.)  Clay indicated that she helped "RHJ apply problem solving techniques to understand why it was not awarded . . . contract[s]."  (*Id.* ¶ 33.)  The company paid Clay between $2000 to $3000 per month for years, but there were no regularly scheduled meetings, no written work product, no email correspondence, no time logs, and neither Jackson nor Clay could estimate how often they met.  (*Id.* ¶¶ 33–34, 42.)  Clay allegedly paid Marshall seventy-five percent of all fees collected from RHJ.  (*Id.* ¶ 34.)  Fort Bend Mechanical, Ltd. ("FBM"), another construction contractor, also subsequently hired Clay as a consultant for $3000 per month.  (*Id.* ¶ 47.)  The sole work

product Clay ever produced for FBM was a one page application for school principals to complete to receive donations.  (*Id.*)  Again, there were no regularly set meetings or email correspondence, and Clay's monthly invoices never contained any details regarding her services.  (*Id.*)  Clay allegedly paid Marshall sixty-five percent of all fees collected from FBM.  (*Id.* ¶ 47.)

The events that give rise to this lawsuit began around late 2007 or 2008, when the HISD board voted to hire additional Job Order Contractors ("JOCs") to supplement the only JOC at that time, Jamail & Smith.  (*Id.* ¶ 35.)  JOCs enable organizations to complete projects quickly because long-term contracts with these pre-approved contractors are already in place.  (*Id.*)  The Request for Proposal seeking additional JOCs was published in March 2008 and applications were due in May 2008.  (*Id.* ¶ 38.)  A major factor in selecting JOCs was the pricing coefficient a contractor offered to use.  (*Id.* ¶ 39.)  The pricing coefficient is a percentile that reflects the difference between the standard price in a pricing manual, or "bid book," and the price a contractor agrees to charge.  (*Id.* ¶ 36.)

After the deadline, a member of the JOC selection committee emailed RHJ and FBM advising them to lower their pricing coefficients.  (*Id.* ¶ 39.)  Other contractors with higher pricing coefficients did not receive such an email.  (*Id.*)  Despite a low pricing coefficient, RHJ was ultimately disqualified because of a pending lawsuit with Fort Bend Independent School District.  (*Id.* ¶ 40.)  The new JOC contractors selected in November 2008 were GRG, FBM, Horizon International, KBR, and Reytec/CBIC.  (*Id.* ¶ 41.)  Within a week of learning that it has not been selected as a JOC, RHJ fired Clay.  (*Id.* ¶ 42.)

The JOC bidding process for construction projects was intended to work as follows: When HISD became aware of a needed repair, it sent out notice to the approved contractors in the region.  (*Id.* ¶ 37.)  The contractors then assessed the scope of work, coordinated with

subcontractors, and submitted their proposals.  (*Id.*)  The contractors would prepare proposals based on the bid book, which contained set prices for the individual elements of a project, and a pricing coefficient.  (*Id.* ¶¶ 36, 39.)  However, the new JOC program started out disorganized, and no projects were assigned for at least six months.  (*Id.* ¶ 50.)  Ultimately, once HISD started awarding projects in June or July 2009, GRG won the majority of the projects.  (*Id.* ¶ 52.)  Furthermore, GRG routinely received praise for the quality and timeliness of its work.  (*Id.*)

In the meantime, in January of 2009, Marshall was elected president of the board.  (*Id.* ¶ 44.)  Shortly thereafter, he began to take steps to add RHJ as a JOC outside the normal application process.  (*Id.*)  Plaintiffs allege that Marshall initially attempted to pressure then-Superintendent Dr. Abe Saavedra ("Saavedra") into awarding RHJ a contract with HISD, causing Saavedra to resign from his post early.  (*Id.* ¶¶ 44–45.)  Marshall eventually succeeded in his efforts to make RHJ a JOC, and later that year, at a board meeting in August 2009, RHJ was approved as a seventh JOC.  (*Id.* ¶ 55.)

Shortly after RHJ was approved as a JOC, GRG stopped receiving new projects.  (*Id.* ¶ 57.)  GRG made several inquiries about the decrease in work, but no one at HISD provided any explanation.  (*Id.*)  Sometime around this time period, Ramirez had lunch with Ricardo Aguirre, the owner of a janitorial company that worked with HISD.  (*Id.* ¶ 58.)  Aguirre advised Ramirez that if he wished to continue doing work for HISD, he had to hire Clay as a consultant.  (*Id.*)  Clay would pay Marshall, and Marshall would then use his influence to ensure GRG continued to get HISD projects.  (*Id.*)  Ramirez did not hire Clay, and from about September 2009, GRG received almost no new projects.  (*Id.* ¶ 61.)

Around this time, Marshall was campaigning in a hotly contested election.  (*Id.* ¶ 62.)  David Medford ("Medford"), the owner of FBM, Medford's family, and FBM all made

numerous campaign contributions to Marshall in the lead-up to the general election and during the subsequent run-off election.  (*Id.*)  In total, these contributions amounted to $58,000, $25,000 of which was never reported.  (*Id.*)  Furthermore, it appears that FBM subsequently reimbursed Medford for a $25,000 check he personally wrote to the campaign, thereby concealing a corporate campaign contribution.  (*Id.*)  Marshall also transferred approximately $25,000 from his campaign through multiple checks written out to either "Larry Marshall" or "cash."  (*Id.* ¶ 63.)  These checks were also not reported on Marshall's campaign finance reports.  (*Id.*) Plaintiffs allege that these contributions to Marshall's campaign, as well as the approximately $27,000 FBM had paid Clay in consulting fees by late 2009, were intended to influence Marshall to use his position to ensure FBM received HISD projects.  (*Id.* ¶ 66.)

In late 2009, the administration prepared a recommendation to the board to renew all existing JOC contracts.  (*Id.* ¶ 67.)  GRG learned that its contract was expected to be renewed at a January 2010 board meeting.  (*Id.* ¶ 68.)  However, a few days before the board meeting at which renewals of JOC contracts were to be discussed, the meeting agenda was changed and the renewals were no longer listed.  (*Id.*)  As a result, for a period of time, the only JOC for HISD was Jamail & Smith, whose contract predated the 2008 JOC program expansion.  (*Id.* ¶¶ 41, 69.) However, RHJ also continued to receive projects during this time period; an auditor had allegedly misinformed the administration that RHJ was also under contract.  (*Id.* ¶ 69.)

In February 2010, HISD released a new Request for Proposal for JOCs, and a selection committee was formed.  (*Id.* ¶ 70.)  All of the previous JOCs applied.  (*Id.*)  The pricing coefficient was again the most important criterion for selection, even though by October 2009, the administration and all JOCs had agreed that it was more efficient for JOCs to use the same coefficient and simply not compete for the same projects.  (*Id.* ¶¶ 51, 71.)  Around April 12 or

13, 2013, the selection committee concluded, based on a ranking system determined largely by a pricing coefficient, that Jamail & Smith, KBR, RHJ, and FBM should be selected as JOCs. (*Id.* ¶ 72.)  Before this decision was submitted for board approval, however, a member of the selection committee asked the four contractors to agree on a uniform pricing coefficient. (*Id.* ¶ 75.)  They did so within a matter of hours. (*Id.*)  They were then presented to the board for approval, and ultimately approved in May 2010. (*Id.* ¶¶ 75–76.)  Notably, RHJ rehired Clay days after learning that it had been selected as a JOC. (*Id.* ¶ 82.)  When GRG, Horizon International, and Reytec/CBIC inquired as to why they were not selected, HISD informed them that the four selected JOCs were ranked higher because of a selection system that heavily weighted the pricing coefficient. (*Id.* ¶ 76.)  GRG contends that it suffered substantial economic harm as a result of not having its JOC contract renewed. (*Id.* ¶ 83.)

Plaintiffs allege that GRG lost project awards starting in September 2009, failed to have its contract renewed, and was not reselected as a JOC because it refused to bribe Marshall by hiring Clay for "an illusory consultant position." (*Id.* ¶ 84.)  They contend that Clay served as a conduit for the payment of bribes by Medford, FBM, Jackson, and RHJ to Marshall, and these bribes were intended to influence Marshall's official acts in selecting JOCs and awarding jobs to JOCs. (*Id.* ¶ 112.)  Clay, in turn, was left with twenty-five to thirty-five percent of the bribes "as consideration for her risk." (*Id.*)  Plaintiffs also allege that the payments made to Marshall's campaign by Medford and FBM were also intended to influence Marshall's official acts in approving JOCs. (*Id.* ¶¶ 62–66, 112.)  Marshall, in turn, allegedly accepted these various payments with the intent to use his position as an HISD trustee to influence the selection of JOCs. (*Id.* ¶¶ 112, 117.)

Plaintiffs allege numerous violations of law by the defendants involved.  The claims brought against the RHJ Defendants include violations of 18 U.S.C. § 1962(c) and (d) of the Racketeer Influenced Corrupt Organizations Act ("RICO Act"), tortious interference with an existing contract, and tortious interference with a prospective contract.  (Compl. ¶¶ 104–135, 155–165.)  Also included are allegations of conspiring to commit an unlawful act.  (Compl. ¶¶ 169–174.)

The RHJ defendants move to dismiss the RICO Act claims, arguing that Plaintiffs have not alleged an enterprise.  (Mot. 2–5.)  They also argue that Plaintiffs have not adequately pled a pattern of racketeering based on bribery under 18 U.S.C. § 201, wire fraud under 18 U.S.C. § 1343, or money laundering under 18 U.S.C. § 1956.  (Mot. 5–10.)  Finally, they move to dismiss the Plaintiffs' claims of tortious interference with an existing contract, tortious interference with a prospective contract, and civil conspiracy.  (Mot. 10–12.)

## II.   LEGAL STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Twombly*, 550 U.S. at 556 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.").  That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678.

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). A district court can consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565

F.3d 228, 232 (5th Cir. 2009) (citation omitted); *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656 (S.D. Tex. 2010).

The Federal Rules of Civil Procedure provide that "leave (to amend the complaint) shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "[G]ranting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (citation omitted). The Court should generally "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Id*. A district court must possess a "substantial reason" to deny a request for leave to amend, but leave to amend is by no means automatic. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (citation omitted). In deciding whether to grant a motion for leave to amend, courts may consider "a variety of factors, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." *Id.* (*citing Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).

## III.    ANALYSIS

### A.    The RICO Act Claims

Plaintiffs allege a number of violations of the RICO Act by Defendants. (Compl. ¶¶ 104–135.) The RICO Act provides in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c)–(d).

Courts frequently discuss 18 U.S.C. § 1962(a)–(c) together.[2]  A civil RICO Act claim under 18 U.S.C. § 1962(a), (b), or (c) involves: "(1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct, or control of an *enterprise*."  *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988) (emphasis in original).  The RHJ Defendants argue that the Plaintiffs do not adequately plead the existence of an enterprise or a pattern of racketeering activity based on bribery under 18 U.S.C. § 201, wire fraud under 18 U.S.C. § 1343, or money laundering under 18 U.S.C. § 1956.  The Court addresses the pattern of racketeering activity requirement first, and then turns to the enterprise element.[3]

### 1.    Pattern of racketeering activity

The RICO Act defines "racketeering activity" to include bribery under 18 U.S.C. § 201, fraud by wire, radio or television under 18 U.S.C. § 1343, and money laundering under 18 U.S.C. § 1956.  18 U.S.C. § 1961(1).  A pattern of racketeering activity "requires at least two acts of racketeering."  18 U.S.C. §1961(5); *Delta*, 855 F.2d at 243.  "To establish a pattern of

---

[2] 18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest . . . any part of such income . . . in acquisition of any interest in, or the establishment or operation of any enterprise."  18 U.S.C. § 1962(a) is not at issue in this case.  (Compl. ¶¶ 104–35.) 18 U.S.C. § 1962(b) states that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . ."  18 U.S.C. § 1962(b) is also not at issue in this case.  (Compl. ¶¶ 104–35.)  In an earlier iteration of their complaint, Plaintiffs had alleged their RICO Act claims under 18 U.S.C. § 1962(b) as well as 18 U.S.C. § 1962(c).  (Doc. No. 105, Third Am. Compl. ¶¶ 162–87.)  However, the Court dismissed with prejudice Plaintiffs' claims under this provision.  (*See* Doc. No. 179, Mem. and Order 23–25.)

[3] The RHJ Defendants do not claim that they are not persons under the RICO Act.  (*See* Compl. ¶ 108.)  Nor do they challenge Plaintiffs' allegations of conspiracy under the RICO Act.  (*See* Compl. ¶¶ 106–07, 133.)  Accordingly, the Court does not address these issues.

racketeering activity, . . . a plaintiff 'must show that the racketeering predicates are *related,* and that they amount to or pose a threat of *continued criminal activity.*'"   *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (*citing H.J. Inc. v. Nw. Bell Tel., Co.*, 492 U.S. 229, 109 (1989)) (emphasis in original).   The element of relatedness is established if the acts have the "same or similar purposes, results, participants, victims, or methods of commission."   *H.J.*, 492 U.S. at 240 (citation omitted).   Continuity of racketeering activity can be established by pointing either to "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."   *Id.* at 241.   A closed period of repeated conduct may be demonstrated "by proving a series of related predicates extending over a substantial period of time."   *Id.* at 242.   An open period of conduct may be shown where there exists a "specific threat of repetition extending indefinitely into the future," or "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business."   *Id.*   In either case, the question of "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case."   *Id.*

Plaintiffs charge the RHJ Defendants with engaging in a pattern of racketeering activity that includes bribery under 18 U.S.C. § 201, wire fraud under 18 U.S.C. § 1343, and money laundering under 18 U.S.C. § 1956.[4]   The RHJ Defendants argue that no pattern of racketeering activity has been pled because Plaintiffs' allegations of predicate offenses are mere legal conclusions.   (Mot. 5–10.)

---

[4] Plaintiffs also charge Defendants with predicate offenses of bribery under Texas Penal Code §36.02, mail fraud under 18 U.S.C. § 1341, retaliation against a witness under 18 U.S.C. § 1513(c), use of the mail in furtherance of any unlawful activity under 18 U.S.C. § 1952, and engaging in monetary transactions in property derived from specific unlawful activity under 18 U.S.C. § 1957.   (*See* Compl. ¶¶ 110–11, 117, 119–20, 122.)   The RHJ Defendants do not challenge the sufficiency of the Complaint with regard to any of those predicate offenses. Accordingly, the Court does not address them.

### a.     Wire fraud under 18 U.S.C. § 1343

18 U.S.C. § 1343 provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

"To prove wire fraud, the government must show a scheme to defraud, the use of wire communications in furtherance of the scheme, and the defendant's specific intent to participate in the scheme." *United States v. Valencia*, 600 F.3d 389, 426 (5th Cir. 2010).  "[F]or purposes of the federal fraud statutes, the term 'scheme to defraud' is not readily defined, but it includes any false or fraudulent pretenses or representations intended to deceive others in order to obtain something of value, such as money."  *United States v. Caldwell*, 302 F.3d 399, 414 (5th Cir. 2002).

The RHJ Defendants appear to recognize the elements of wire fraud (*see* Mot. 6), but then proceed to analyze whether Plaintiffs have adequately pled a claim of fraud under Texas state law.  (Mot. 6–8.)  They argue that Plaintiffs have not identified with adequate specificity a speaker, a fraudulent statement, or details of when the fraudulent statement was made.  (*Id.* at 7.)  They also argue that Plaintiffs have not adequately pled facts to support the scienter requirement. Of course, whether Plaintiffs have pled fraud under Texas state law is irrelevant, because the predicate offense Plaintiffs allege is wire fraud under 18 U.S.C. § 1343.  Furthermore, as the Court made clear in its previous Memorandum and Order, wire fraud does not require a false representation.  (Doc. No. 179, Mem. and Order 16–17 (citing *Shushan v. United States*, 117 F.2d 110, 115 (5th Cir. 1941), *overruled on other grounds by United States v. Cruz*, 478 F.2d

408, 412 (5th Cir. 1973); *United States v. Bruno*, 809 F.2d 1097, 1105 (5th Cir. 1987)).)  As this Court has already explained, a scheme to defraud includes a scheme "to deprive another of the intangible right of honest services."  *Id.* (citations omitted.)  In analyzing the scope of honest services fraud, the Supreme Court held that it covers individuals who partake in bribery or kickback schemes.  *Skilling v. United States*, --- U.S. ---, 130 S. Ct. 2896, 2931 (2010).  This is exactly what Plaintiffs have pled here.

To the extent that the RHJ Defendants argue that Plaintiffs failed to meet the stringent pleading requirements of Rule 9(b), the Court has also rejected this argument before.  Plaintiffs had previously pled when the alleged scheme to defraud occurred, who was involved, and how money was transferred to Marshall (*see* Doc. No. 179, Mem. and Order 17–18 (citing Third Am. Compl. ¶¶ 35, 60–62, 83, 87)), and they have done so again in even greater detail.  (*See* Compl. ¶¶ 32–34, 42, 44–45, 55, 57, 82 (discussing the RHJ Defendants' involvement in kickback scheme with Clay and Marshall.)  RHJ allegedly made monthly payments ranging from $2000 to $3000 dollars to Clay for years, but no evidence exists that Clay performed any work for these payments.  (*Id.* ¶¶ 33–34, 42.)  Clay allegedly paid Marshall seventy-five percent of all fees collected from RHJ.  (*Id.* ¶ 34.)  When RHJ was not selected as a JOC in 2008, it immediately ceased making these payments to Clay.  (*Id.* ¶ 42.)  Marshall subsequently attempted to convince the past superintendent to add RHJ as a JOC contractor outside the normal selection process, and despite the superintendent's objections, RHJ was eventually added as a seventh JOC at a time when HISD was not otherwise soliciting applications.  (*Id.* ¶¶ 44–45.) Upon learning that it was re-selected as a JOC in 2010, RHJ immediately resumed making payments to Clay.  (*Id.* ¶ 82.) These allegations also support the inference that the payments the RHJ Defendants made to Clay were made with the requisite scienter of "specific intent to participate in the scheme." *See*

*Valencia*, 600 F.3d at 426.  The pleadings support Plaintiffs' allegations of honest services fraud.

Accordingly, Plaintiffs have adequately pled the predicate offense of wire fraud.[5]

### b.       Bribery under 18 U.S.C. § 201

18 U.S.C. § 201 provides in relevant part:

(b) Whoever--

> (1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent--
>
>> (A) to influence any official act . . . .

The RHJ Defendants argue that Plaintiffs have not pled any facts to support their allegation that the RHJ Defendants committed the predicate offenses of bribery.  (Mot. 8.)  They also argue that the only facts Plaintiffs pled are indicative of political contributions, which, as a matter of law, are not bribery.  (Mot. 8–9.)

These arguments are meritless.  Even a cursory review of the live Complaint and the Court's last Memorandum and Order would render unnecessary and inadvisable each argument that has been advanced.  As explained *supra* Part III.A.1.a, Plaintiffs have pled a great many facts to support the inference that the RHJ Defendants made payments to Marshall via Clay, which were intended as a bribe in order to obtain contracts with HISD.  The RHJ Defendants' second argument, challenging the validity of a bribery allegation based on political contributions, is even more frivolous, given that the only political contributions discussed in the Complaint

---

[5] The RHJ Defendants do not challenge the sufficiency of the pleadings with regard to the requirement that the fraud involve a transmission by wire.  As such, the Court does not test the sufficiency of the pleadings with regard to that element of wire fraud.

were made by FBM and Medford.  (*See* Compl. ¶¶ 62–66.)[6]  Even if a defendant's political contributions were always immune from allegations of bribery[7], this would not help the RHJ Defendants, as the facts pled do not accuse them of attempting to bribe Marshall through campaign contributions.  The allegations against the RHJ Defendants are premised on the monthly payments made to Clay, which Plaintiffs contend were bribes and not payment for consulting services.  (*See* Compl. ¶¶ 32–34, 42, 44–45, 55, 57, 82.)  Plaintiffs have adequately pled the predicate offense of bribery under 18 U.S.C. § 201.

In the part of their motion addressing 18 U.S.C. § 201, the RHJ Defendants also argue, in two brief sentences that lack any legal support, that Plaintiffs have not pled facts to support their assertion that the RHJ Defendants are engaged in interstate acts of commerce or that the acts they were allegedly involved in have a potential effect on interstate commerce.  (Mot. 9.)  18 U.S.C. § 201, by its own terms, does not require a showing that a defendant is engaged in interstate acts of commerce or that its acts have a potential effect on interstate commerce.  The RICO Act does require that the enterprise's activity's "affect[] interstate or foreign commerce."  18 U.S.C. § 1962(c).  The Court assumes that the RHJ Defendants are attempting to argue that Plaintiffs have not pled facts to support this element of a RICO Act violation.  However, this argument, too, is without merit.  The law is clear that "[t]he nexus with interstate commerce required by RICO is minimal."  *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350, 1353 (5th Cir. 1985) *abrogated on other grounds by H.J.*, 492 U.S. at 233 (citations and quotation marks omitted).  Allegations that a defendant used an instrumentality of interstate commerce, such as the United States Postal

---

[6] Plaintiffs do at times point out that Clay was Marshall's campaign manager, but their allegations are consistent in saying that the payments made by the RHJ Defendants to Clay were for supposed consulting services.  (*See* Compl. ¶¶ 32–34, 42, 82, 112, 126.)  Plaintiffs never alleged the RHJ Defendants' payments were campaign contributions.

[7] This Court has already rejected any such argument, explaining that, even when payments are political contributions, Plaintiffs may still show that these payments were made as part of a "quid pro quo, that is, that the official took money in return for an exercise of his official power," in violation of 18 U.S.C. § 201.  (*See* Doc. No. 179, Mem. and Order 12–14 (citations omitted).)

Service, are sufficient to meet this requirement.  *Id.*; *see also Verges v. Babovich*, 644 F. Supp. 150, 155 (E.D. La. 1986)*; Dimas v. Vanderbilt Mortg. & Fin., Inc.*, No. C–10–68, 2010 WL 3342216, at *14 n.6 (S.D. Tex. Aug. 25, 2010).   Here, Plaintiffs alleged that Clay regularly mailed invoices to collect the alleged bribes from the RHJ Defendants, and the RHJ Defendants mailed the alleged bribes as checks to Clay.  (*See* Compl. ¶¶ 33, 117, 120.)   Accordingly, Plaintiffs have adequately pled a nexus with interstate commerce, as required by the RICO Act.

**c.     Money laundering under 18 U.S.C. § 1956**

The crime of money laundering occurs when a person who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956.  To establish money laundering under 18 U.S.C. § 1956, a plaintiff must show that a defendant "(1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further unlawful activity."  *United States v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001).

The RHJ Defendants argue that Plaintiffs have not identified a financial transaction, have not stated facts to suggest that this transaction involved the proceeds of some illegal activity, and have not pled facts to support the scienter factor.  (Mot. 9–10.)  The Court agrees that Plaintiffs have not explained how the financial transactions conducted by the RHJ Defendants "involved the proceeds of an unlawful activity."  *Dovalina*, 262 F.3d at 475.  Plaintiffs appear to argue, as they did previously with regard to the FBM Defendants, that these payments constitute acts of money laundering because the payments themselves are illegal.  (Resp. 13 (describing the money Clay received from RHJ as "illegal money").)  However, the Court has already rejected this

16

argument and explained that the plain language of the statute and Fifth Circuit precedent both mandate that the financial transaction involve funds that are the *profits or receipts* of illegal activity. (*See* Doc. No. 179, Mem. and Order 18–19 (citing *Wilson v. Roy*, 643 F.3d 433, 435–37 (5th Cir. 2011) (emphasis added).) Plaintiffs have entirely failed to explain how the payments RHJ made to Clay involved the proceeds of illegal activity; they have only alleged that making these payments constituted an illegal act.

The Court has previously spelled out the problem with Plaintiffs' allegations of money laundering with regard to the FBM Defendants. (*See* Doc. No. 179, Mem. and Order 18–20.) The allegations with regard to the RHJ Defendants suffer from the same deficiencies. The Court is convinced that further leave to amend would be futile because Plaintiffs have had many opportunities to properly plead this predicate offense since this case was filed in 2010, have had detailed guidance from this Court, and have nonetheless demonstrated an inability or unwillingness to cure this defect. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) ("[L]eave to amend properly may be denied when the party seeking leave has repeatedly failed to cure deficiencies by amendments previously allowed and when amendment would be futile."). Accordingly, Plaintiffs' RICO Act claim based on the predicate offense of money laundering is dismissed with prejudice as to the RHJ Defendants.

### 2.   Enterprise

A plaintiff alleging a civil RICO Act violation must also plead the existence of an enterprise. *Brunig v. Clark*, 560 F.3d 292, 297 (5th Cir. 1009). An enterprise for the purposes of the RICO Act can be either a legal entity or an association-in-fact. 18 U.S.C. § 1961(4); *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995). "To establish an 'association in fact' enterprise under 18 U.S.C. § 1961(4), plaintiffs must show evidence of an ongoing organization, formal or

informal, and . . . evidence that the various associates function as a continuing unit." *Atkinson*, 808 F.2d at 440.  The association-in-fact enterprise must have "an existence that can be defined apart from the commission of the predicate acts."  *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 748 (5th Cir. 1989).  "However, if the individuals associate together to commit several criminal acts, their relationship gains an ongoing nature, coming within the purview of RICO."  *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir. 1987).

The RHJ Defendants argue that Plaintiffs have not pled an enterprise because all of the defendants are associated with different legal entities, and the association-in-fact enterprise alleged did not have an existence apart from the pattern of racketeering.  (Mot. 2–5.)  In raising these arguments, the RHJ Defendants have again completely ignored this Court's prior order. The Court has previously recognized that when "individuals associate to engage in several, ongoing criminal acts, they may form an association-in-fact."  (*See* Doc. No. 179, Mem. and Order 20–23 (citing *Montesano*, 818 F.2d at 427).)  Although the Court noted that Plaintiffs had not alleged one enterprise that connected all of the Defendants, the facts pled did suggest an association between Marshall, Marshall & Associates, Clay, JM Clay & Associates, and the FBM Defendants, wherein FBM regularly, over the course of several years, paid bribes to Clay's company, JM Clay, and JM Clay transferred some portion of those funds to Marshall or Marshall & Associates.  (*Id.* at 21–22.)  Of course, the same principle would hold true for Marshall, Marshall & Associates, Clay, JM Clay & Associates, and the RHJ Defendants.  Plaintiffs appropriately amended their pleadings and pled two separate enterprises, one between Marshall, Marshall & Associates, Clay, JM Clay & Associates, and the FBM Defendants, and another between Marshall, Marshall & Associates, Clay, JM Clay & Associates, and the RHJ

Defendants.  (Compl. ¶¶ 123–24.)  Plaintiffs have adequately pled that the RHJ Defendants, over the course of many years, paid bribes to Clay or her company, JM Clay & Associates, and Clay transferred a substantial portion of those payments to Marshall or Marshall & Associates, and these payments were intended to influence Marshall into using his influence as a member of the HISD board to award construction contracts to the RHJ Defendants.   (*See id.* ¶¶ 32–34, 42, 44–45, 55, 57, 82, 112, 126.)  Such an ongoing association-in-fact designed to engage in criminal activity is within the purview of the RICO Act.  *Montesano*, 818 F.2d at 427.

### B.      Tortious Interference with Existing Contract

Plaintiffs also allege that the RHJ Defendants tortiously interfered with an existing contract.  (*See* Compl. ¶¶ 57–61, 84, 161–65; Third Am. Compl., Ex. 35.[8])  Under Texas law, a plaintiff must establish the following elements to succeed on a tortious interference with contract claim: (1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss.  *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 774 (S.D. Tex. 2010); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).   "A plaintiff alleging tortious interference with contract must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its contract obligations."  *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 674–75 (S.D. Tex. 2010) (citing *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied); *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139–40 (Tex. App.—Eastland 1992, writ denied);  *Dunn v. Calahan*, No. 03–05–00426–CV, 2008 WL 5264886, at *3 (Tex. App.—Austin Dec. 17, 2008, pet. denied) (mem. op.)).   "The plaintiff must present evidence that a contract provision was breached."  *Id.* (citing *N.Y. Life Ins. Co. v. Miller*,

---

[8] Plaintiffs have incorporated by reference the exhibits attached to their previous complaint into the live Complaint. (Compl. ¶ 31 n.2.)

114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.)); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App.—Texarkana 1999, pet. denied).

The RHJ Defendants contend that Plaintiffs offer only threadbare recitations of the elements of this cause of action.   (Mot. 10–11.)   The Court does not agree with this characterization of Plaintiffs' sixty-three page Complaint.   Nonetheless, the Court does conclude that Plaintiffs have not pled facts to sustain a claim for tortious interference with an existing contract.   The only existing contract Plaintiffs point to is the JOC contract GRG had with HISD. (Compl. ¶¶ 41, 161–65; Third Am. Compl., Ex. 35.)   Plaintiffs argue, in their Response, that this contract entitled GRG to "an equal share of HISD JOC work."   (Resp. 15 n.1.)   However, as Plaintiffs' Complaint reveals, the JOC contract, by its own terms, did not bestow upon GRG the right to receive any projects, instead only stating that "HISD *may* issue from time to time Job Orders to the Contractor pursuant to this Contact."   (Third Am. Compl., Ex. 35 at 11 (emphasis added).)   Accordingly, the Court cannot see how any actions by other defendants directed at receiving a disproportionate share of HISD construction projects could interfere with GRG's JOC contract, as the contract does not promise GRG any particular share of HISD work. Plaintiffs' allegations, if true, undoubtedly placed GRG at an unfair disadvantage, and legal remedies exist for such wrongdoing.   *See supra* Part III.A.   However, Plaintiffs have not, and indeed, cannot, in light of the contractual terms, argue that the alleged bribes paid by the RHJ Defendants induced HISD to breach its contract obligations under the JOC agreement with GRG. *Rimkus*, 688 F. Supp. 2d at 674–75 (citations omitted) (explaining that tortious interference with an existing contract requires proof that a defendant induced a contracting party to actually breach an existing contract with a plaintiff).   In light of these contractual terms, leave to amend would be futile.   *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir.

2010) (holding that denial of leave to amend may be appropriate when amendment would be futile); *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) (A proposed amendment is futile if "the amended complaint would fail to state a claim upon which relief can be granted.").  Plaintiffs' claim of tortious interference with an existing contract is dismissed with prejudice.

### C.    Tortious Interference with Prospective Business Relationship

Plaintiffs also allege that the RHJ Defendants tortiously interfered with a prospective business relationship.  (*See* Compl. ¶¶ 57–61, 68–69, 82–85, 155–60.)  In order to establish this claim under Texas law, a plaintiff must prove: (1) a reasonable probability that the plaintiff would have entered into a business relationship, (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.  *M-I*, 733 F. Supp. 2d at 775; *Plotkin v. Joekel*, 304 S.W.3d 455, 487 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The RHJ Defendants address this claim together with Plaintiffs' claim of tortious interference with an existing contract, arguing that Plaintiffs offer only a formulaic recitations of the elements.  (Mot. 10–11.)  As noted *supra* Part III.B, the Court disagrees with this characterization of Plaintiffs' Complaint.  Here, Plaintiffs have alleged that GRG frequently won bids under its JOC Contract before RHJ was added as a JOC, and had been told by at least one member of HISD board that it could expect its JOC contract to be renewed.  (Compl. ¶¶ 52, 68.) Plaintiffs also allege that, typically, JOCs are retained for a substantially longer period of time

than one year.  (*Id.* ¶ 83.)  These allegations are sufficient to support the inference that GRG would have entered into future JOC contracts, and would have received future job order assignments under the JOC contracts.[9]  Plaintiffs have also plausibly alleged that the RHJ Defendants engaged in independently unlawful acts that prevented the formation of future contracts between GRG and HISD.  *See supra* Part III.A.1.a–b.  By making illicit payments to Marshall, the RHJ Defendants surely knew of the substantial likelihood that contractors who did not engage in bribery would lose contracts with HISD as a result.  GRG suffered substantial damages as a consequence of losing its JOC contract and the job order assignments it would likely have received as a JOC.  (Compl. ¶¶ 83–85.)  Accordingly, Plaintiffs have stated a claim for tortious interference with a prospective business relationship.

### D.    Civil Conspiracy

Plaintiffs also charge the RHJ Defendants with engaging in a civil conspiracy.  (Compl. ¶¶ 169–74.)  Under Texas law, the elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.  *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).  "[C]onspiracy is not an independent cause of action but requires an underlying tort."  *Zarzana v. Ashley*, 218 S.W.3d 152, 159 (Tex. App.—Houston [14th Dist.] 2007, pet. struck).

The RHJ Defendants argue that Plaintiffs' claim of civil conspiracy must be dismissed because they have not pled the existence of an underlying tort.  (Mot. 11–12.)  The Court disagrees.  As explained *supra* Part III.C, Plaintiffs have pled tortious interference with a

---

[9]  The Court is aware, of course, that obtaining a JOC contract would not have guaranteed GRG job order assignments.  *See supra* Part III.B.  However, the facts pled suggest that GRG would have been likely to receive at least some job order assignments; after all, it had previously won many assignments before RHJ was added as a JOC.  (Compl. ¶¶ 52, 57.)

prospective business relationship.[10]   The Court declines to dismiss Plaintiffs' claim of civil conspiracy against the RHJ Defendants on this basis.

## IV.    CONCLUSION

Based on the foregoing, the RHJ Defendants' Motions to Dismiss (Doc. No. 196) is **GRANTED IN PART and DENIED IN PART**.  Specifically, Plaintiffs' RICO Act claims against the RHJ Defendants premised on 18 U.S.C. § 1956 and Plaintiff's tortious interference with an existing contract claims are **DISMISSED WITH PREJUDICE**.  The remainder of the RHJ Defendants' Motion to Dismiss is **DENIED**.

The Court wishes to note that many of the arguments raised by the RHJ Defendants were thoroughly addressed in the Court's previous Memorandum and Order.  Similarly, the claims the Court now dismisses with prejudice were also previously discussed in detail in its previous Memorandum and Order.   The Court expects parties to refrain from bringing claims or arguments based on logic the Court has already rejected.


**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 25th day of June, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[10] The RHJ Defendants also argue that civil conspiracy is not a cause of action under Texas law.  This is plainly inaccurate.  Civil conspiracy is not an independent cause of action, *see Zarzana*, 218 S.W.3d at 159, but it is most certainly a cause of action.