UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **THE GIL RAMIREZ GROUP, LLC, et al.,** | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **Case No. 4:10-cv-4872** |
| | § | |
| **HOUSTON INDEPENDENT SCHOOL DISTRICT, et al.,** | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Defendant Houston Independent School District's ("HISD")

Motion for Summary Judgment ("HISD's Motion"; Doc. No. 243) and Defendants Lawrence

Marshall ("Marshall") and Marshall and Associates' ("M Associates") (collectively, "the

Marshall Defendants") Motion for Summary Judgment ("Marshall's Motion"; Doc. No. 253).[1]

Also before the Court are a Motion to Exclude Expert Witness (Doc. No. 272) and Objections to

Plaintiffs' Summary Judgment Evidence (Doc. No. 277), which are filed by both the Marshall

Defendants and HISD. Defendants Marshall and HISD have also filed a Joint Motion to Exclude

Expert Testimony of Kenneth Wilson (Doc. No. 275). Finally, HISD has also filed two Motions

to Dismiss (Doc. Nos. 241, 244). After considering all of the parties' filings, all responses and

replies thereto, all of the evidence presented, and the applicable law, the Court finds that

Defendants' motions should be **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Defendant Joyce Moss-Clay ("Clay") has filed a document entitled "Joinder of Defendants Lawrence Marshall and Marshall and Associates' Motion for Summary Judgment." (Doc. No. 254.) The Court will treat Clay's filing as a notice of her intent to join Marshall's Motion.

## I.     BACKGROUND[2]

Plaintiffs The Gil Ramirez Group ("GRG") and Gil Ramirez, Jr. ("Ramirez") bring this suit against HISD, Marshall, Clay, two construction businesses, RHJ-JOC ("RHJ") and Fort Bend Mechanical, Ltd. ("FBM"), and their owners. GRG is a commercial construction and repair business founded and principally owned by Ramirez. GRG, RHJ, and FBM compete for construction contracts from HISD. Marshall is an HISD trustee and Clay is a business associate of Marshall's. The claims in this lawsuit arise out of alleged improprieties in the awarding of some of HISD's construction and repair contracts. The parties hotly contest the facts in this case.

Plaintiffs contend Marshall has a lengthy history of abusing his position as an HISD trustee. Plaintiffs' Responses to Dispositive Motions at 38 ("Plaintiffs' Response"; Doc. No. 263). Marshall began working for HISD as a teacher, and after teaching for five years, he was an HISD administrator for about thirty years. Deposition of Lawrence Marshall, Vol. I at 93, Oct. 16, 2012 ("Marshall Deposition I"; Doc. No. 265-170). In 1997, Marshall was elected HISD Trustee, and has served as such since. *Id.* In 1999, Plaintiffs allege, Marshall attempted to use his influence to assign all HISD employees who did not designate a primary physician to a physicians' group called Peoples First, for which he served as a paid consultant.  Deposition of Frank Watson at 24-30, 44-45, Oct. 25, 2012 ("Watson Deposition"; Doc. No. 265-167). Marshall subsequently served as a consultant for another organization, Community Education Partners ("CEP"), from about 2000 through approximately 2003 or 2004, during his time as a trustee.  Marshall Depo. I at 96-97, 101. When HISD revised its ethics rules in 2004 to bar trustees from working for school district contractors, he recommended CEP hire Clay, a close

---

[2] The following facts are drawn from the parties' submissions concerning the motions for summary judgment. In adjudicating those motions, the Court draws all reasonable inferences in the light most favorable to the nonmoving party. The allegations set forth in Plaintiffs' Fourth Amended Complaint ("FAC"; Doc. No. 181) are accepted as true for purposes of the pending Motions to Dismiss.

friend and his campaign treasurer. Marshall Depo. I at 97-99. Around the time that he ended his relationship with CEP, Marshall began receiving income from Clay's consulting business. Deposition of Lawrence Marshall, Vol. II at 294-95, Nov. 28, 2012 ("Marshall Deposition II"; Doc. No. 265-171). Marshall denies that this income was from payments CEP made to Clay. Marshall Depo. I at 99. Plaintiffs also allege that Marshall, along with others, received inappropriate gifts from federally funded program vendors, causing HISD to lose millions of dollars of technology funding. Third Amended Complaint at 18, *U.S. ex rel Dave Richardson v. Analytical Computer Services, Inc.*, No. H-05-3836 (S.D. Tex. filed Nov. 14, 2005) (Doc. No. 265-106). Plaintiffs allege that Scott Blankenship, a representative of one such vendor, hired Clay as well, and that Marshall also received a portion of the fees this vendor paid to Clay. Pls.' Resp. at 44-45; Marshall Calendar Entries ("Scott" or "Scott B.") (Doc. Nos. 265-108-265-115); Clay bank records (Doc. No. 265-77); Marshall Depo. II at 403, 414.

The construction company defendants in this case also hired Clay as a consultant. As early as 2003, the predecessor company to RHJ hired Clay to "provide moral support" to Eva Jackson ("Jackson"), who subsequently became the owner of RHJ. Deposition of Eva Jackson at 30-33, Sept. 13, 2012 ("Jackson Deposition"; Doc. No. 265-173). Clay stated that she provided to RHJ "[c]oaching, strategic planning," and similar services to "enter markets" or increase its market share. Deposition of Joyce Moss-Clay at 11, Sept. 11, 2012 ("Clay Deposition"; Doc. No. 265-174). The company paid Clay between $2,000 to $3,000 per month for years, but there were no regularly scheduled meetings and no written work product, and neither Jackson nor Clay could estimate how often they met. Clay Depo. at 11-15; Jackson Depo. at 30-35. Clay paid Marshall as much as seventy-five percent of all fees collected from RHJ. Clay Depo. at 9-10.

In 2009, FBM also hired Clay as a consultant for $3000 per month. Clay Depo. at 28-32. And, FBM paid for tickets, travel expenses, and accommodations for Marshall to attend the Super Bowl in February, 2009. Marshall Depo. II at 314-17. At the game, he sat with Clay's husband, FBM's owner David "Pete" Medford ("Medford"), and Medford's wife. Marshall denies that he was Medford's guest; he states that he was Clay's guest. *Id.* Plaintiffs allege that Marshall was supposed to disclose such gifts, but never did. *See* Disclosure of Interest Forms, Jan. 15, 2009-July 16, 2012 (Doc. Nos. 265-208-265-15). Plaintiffs also note that the contract between Clay and FBM was dated January 30, 2009, and became effective on February 1, the date of the Super Bowl. Personal Services Agreement between JM Clay and Medford, Jan. 30, 2009 (Doc. No. 265-99). It was only after the Super Bowl that FBM made arrangements to pay Clay. Email from Sharon Medford to Harvey Klinkerman, Feb. 4, 2009 (Doc. No. 265-2). Additionally, in a recorded conversation with Wayne Dolcefino, Medford states that he has also given Marshall approximately $150,000 in cash gifts since 2008. Conversation between Mr. Pete Medford and Mr. Wayne Dolcefino at 46, 53 ("Medford-Dolcefino Recording"; Doc. No. 265-181).

Clay reports that she was hired to assist Medford in making charitable contributions to HISD schools. Clay Depo. at 30-48. The sole work product Clay ever produced for FBM was a one-page application for school principals to complete to receive donations. *Id.* Again, there were no regularly set meetings or email correspondence, and Clay's monthly invoices never contained any relevant details regarding her services. *Id.* Clay paid Marshall sixty-five percent of all fees collected from FBM. *Id.* at 49. Clay reports that she shared fees with Marshall because he mentored her. Clay Depo. at 16, 59-60.

The events that give rise to this lawsuit began around late 2007 and 2008. In 2007, voters approved an $805 million bond to construct twenty-four new schools and renovate 134 existing schools. At that time, HISD's only Job Order Contractor ("JOC") was Jamail & Smith, another construction company. Deposition of Elvis Eaglin at 16, July 16, 2013 ("Eaglin Deposition"; Doc. No. 253-4); Deposition of Robert Moore at 31, July 16, 2013 ("Moore Deposition"; Doc. No. 253-5). A JOC program allows an organization to hire one or more contractors to provide maintenance, repairs, and minor construction and facility upgrade work through a single competitive bidding process, without having to undertake a separate procurement process for each job. Decl. of Elvis Eaglin ¶ 3 ("Eaglin Declaration"; Doc. No. 246). A Request for Proposals seeking additional JOCs to complete the work to be paid for by the newly approved bond measure was published, and applications were due in May 2008. Eaglin Decl. ¶ 4; 2008 Supplemental Request for Proposals ["RFP"]: Project 08-03-05 ("2008 Supplemental Procurement"; Doc. No. 253-6).  A major factor in selecting JOCs is the pricing coefficient a contractor offers to use. Eaglin Decl. ¶¶ 3, 6. The pricing coefficient is a percentile that reflects the difference between the standard price for a particular job in a pricing manual and the price a contractor agrees to charge. *Id.*

Eleven contractors submitted proposals in May 2008, including GRG, RHJ, and FBM. Eaglin Decl. ¶ 4; Email from Elvis Eaglin to Willie T. Burroughs, et al., July 24, 2008 (Doc. No. 253-7); Elvis Eaglin, RPF [sic] 08-03-05: RFP to Supplement HISD's Current Job Order Contract: Pricing Coefficients for HISD, Aug. 6, 2008 ("2008 Pricing Coefficients"; Doc. No. 253-8). At the time, GRG was a new company. Deposition of Gil Ramirez, Jr. at 19, June 19, 2012 ("Ramirez, Jr. Deposition"; Doc. No. 250). HISD administrators formed a committee to evaluate the proposals and make a recommendation to the Board, which had ultimate

responsibility for awarding the JOC contracts. Eaglin Decl. ¶¶ 3-5; Email from Elvis Eaglin to Willie T. Burroughs, et al., July 24, 2008.

After the deadline for proposals, a member of the JOC selection committee communicated with vendors, including RHJ and FBM, regarding their pricing coefficients. According to HISD, no vendors were permitted to change their total coefficients, but vendors were allowed to reallocate within the various categories making up their total coefficients. Eaglin Decl. ¶ 19; Eaglin Depo. at 57-58. HISD claims that such communications were not limited to RHJ and FBM, *see id*., but Plaintiffs claim that such communications were sent only to RHJ and FBM. *See* Emails from Elvis Eaglin to Eva Jackson (RHJ) and John Thomas (FBM), June 6, 2008 (Doc. Nos. 265-64, 265-65).

The selection committee initially eliminated those bidders with a high pricing coefficient, including GRG. Eaglin Decl. ¶ 6; 2008 Pricing Coefficients. In fact, GRG ranked ninth in terms of pricing coefficients. The selection committee continued with its process and eventually decided to recommend RHJ and Kellogg Brown & Root Services, Inc. ("KBR"). Eaglin Decl. ¶ 7; Email from Elvis Eaglin to Willie T. Burroughs, et al., Aug. 25, 2008 (Doc. No. 253-12). RHJ and KBR scored the highest of the four finalists, which also included Centennial and Trevino, two other contracting companies. Eaglin Decl. ¶¶ 6-7; Email from Elvis Eaglin to Richard Lindsay & Melinda Garrett, Aug. 12, 2008 (Doc. No. 246-2). RHJ was disqualified by HISD administrators because of a pending lawsuit with Fort Bend Independent School District ("Fort Bend ISD"); HISD had taken that position previously with another vendor, and administration officials felt that consistency was important, even if there was nothing in the law preventing HISD from hiring a contractor which was involved in litigation. Declaration of Richard Lindsay ¶ 5 ("Lindsay Declaration"; Doc. No. 253-13); Moore Depo. 71-75.

Thereafter, without going through the selection committee process, Richard Lindsay ("Lindsay"), HISD's Chief Business Operations Officer, and then-Superintendent Dr. Abelardo Saavedra ("Saavedra") unilaterally added three vendors to the list: FBM for its heating, ventilation, and air conditioning expertise, and GRG, Horizon Group ("Horizon"), and Reytec/CBIC ("Reytec") to increase JOC diversity. Lindsay Decl. ¶ 4; Eaglin Decl. ¶¶ 8-9. The JOCs presented to and unanimously approved by the Board in November 2008 were GRG, FBM, Horizon, KBR, and Reytec. *Id.*; HISD Bd. of Educ. Meeting Minutes at 9, Nov. 12, 2008 (Doc. No. 253-15). Within a week of learning that it has not been selected as a JOC, RHJ fired Clay. Letter from RHJ to Joyce Moss-Clay, Nov. 19, 2008 (Doc. No. 265-10).

GRG executed a one-year JOC contract with HISD on December 17, 2008. Contract Between HISD and GRG for Job Order Construction Contract at Art. 14, Dec. 17, 2008 ("2008 JOC Contract"; Doc. No. 265-28). According to its terms, HISD had the unilateral right to renew the one-year contract for up to two additional one-year periods. *Id.* at Art. 15. The contract made no guarantees regarding renewal or the number of JOC jobs GRG would receive. *Id.* at Arts. 2, 14.

HISD used the JOCs to complete "quick start" projects, such as installing security cameras or fences. Declaration of Willie Burroughs ¶ 4 ("Burroughs Declaration"; Doc. No. 250-1). When HISD's outside project management companies recommended a particular "quick start" project, HISD administrators assigned them to the approved JOCs. *Id.* No projects were assigned for at least six months, until the summer of 2009, and, at that time, several were awarded, as there was something of a backlog. *Id.* Plaintiffs allege that, in contravention of acceptable industry practice, some of the JOCs were required to bid against each other for jobs. Pls.' Resp. at 68; Affidavit of Gil Ramirez, Jr. ¶ 5 ("Ramirez Affidavit"; Doc. No. 265-39). GRG

and Horizon submitted to HISD officials a report containing several recommendations for improving and streamlining the JOC program. Email from Ramirez to Willie Burroughs, July 30, 2009 (Doc. No. 265-76). One of those recommendations was the use of a single pricing coefficient. *Id.* Plaintiffs claim that, by October, 2009, "it appeared all the JOCs agreed to use the same coefficient." Pls.' Resp. at 69. However, in support, Plaintiffs cite only an October 2009 email from Willie Burroughs referring to amending the JOC contracts "to reflect the changes in the coefficient." Email from Willie Burroughs to Elvis Eaglin, et al., Oct. 14, 2009 (Doc. Nos. 265-31, 265-32).

Once HISD started assigning projects in the summer of 2009, GRG was assigned the majority of the projects, at least by dollar value. Ramirez Aff. ¶ 5; Declaration of Jeffrey A. Compton ("Compton Declaration"), Ex. C, JOC Contract Data ("JOC Contract Data"; Doc. No. 250-2). In July and August of 2009, GRG was awarded $1,842,390.54 in JOC projects, which was ninety percent of the total dollar value of JOC jobs that it was assigned. Compton Decl. ¶ 5. Ramirez, Jr.'s affidavit claims that GRG routinely received praise for the quality and timeliness of its work. Ramirez Aff. ¶ 7. However, HISD presented evidence in Ramirez, Jr.'s deposition that GRG started JOC work without, or did not provide, the proper permissions, paperwork, or, sometimes, bonding. Ramirez, Jr. Depo. at 201-210, 252-265. An official with the project management company overseeing GRG's JOC work also testified to numerous problems with GRG's performance. Deposition of Daryl Bailes at 30-51, 54-55, 56-58, Dec. 6, 2012 ("Bailes Deposition"; Doc. No. 265-185).

In the meantime, Marshall had been elected president of the HISD Board, in January of 2009. In February, 2009 Saavedra had resigned, effective as of August 31, 2009. Deposition of Dr. Abelardo Saavedra at 69-70, 73, Dec. 12, 2012 ("Saavedra Deposition"; Doc. No. 265-175).

Plaintiffs contend that Marshall did not support Saavedra and forced him out. Saavedra Depo. at 70, 130-36, 84-85. Then, in August 2009, after he had announced his resignation but before he left, Saavedra recommended that RHJ be added as a JOC because its lawsuit against Fort Bend ISD had been resolved. The Board approved the recommendation. Lindsay Decl. ¶ 5; Moore Depo. at 74-77; HISD Bd. of Educ. Meeting Minutes at 13, Aug. 13, 2009 (Doc. No. 253-18). Plaintiffs allege that Marshall had long pressured Saavedra to make a recommendation to add RHJ.[3] Saavedra Depo. at 75-76; Deposition of Stephen Pottinger at 31, June 29, 2013 ("Pottinger Deposition"; Doc. No. 265-186).

Shortly after RHJ was approved as a JOC, GRG saw a marked decrease in the number of new projects it was assigned, though it continued to receive some assignments through January 2010. Ramirez Aff. ¶ 10; Compton Decl. ¶ 5; *see* JOC Contract Data.  HISD reports that, at that time, it contracted with a number of security camera companies for security camera installation, which reduced the total number of available JOC projects. Burroughs Decl. ¶ 4. Other JOCs, including Horizon, continued to receive JOC jobs. *See* JOC Contract Data. GRG made several inquiries about the decrease in work, but no one at HISD provided an explanation. Ramirez Aff. ¶ 10.

---

[3] Plaintiffs also report pressure from Jackson herself, who allegedly asked Saavedra's wife to lunch, where she sought to "give [her] husband some money." Deposition of Myrna Saavedra at 11-15, Feb. 19, 2013 ("Myrna Saavedra Deposition"; Doc. No. 265-180). However, it is not at all clear when this lunch was – according to the deposition, it may have been as early as 2005 or 2006, long before the JOC contracting process considered here happened. In addition, Plaintiffs cite a meeting Marshall had with Saavedra and Melinda Garrett, another high-level HISD administrator, and allege that it was to pressure them to hire RHJ after the lawsuit was settled, citing to Marshall's deposition. Pls.' Resp. at 71. However, Marshall's deposition reveals that the meeting was held several years earlier, around 2004, after RHJ was not selected as HISD's JOC at that time. Marshall Depo. II at 280-82. Plaintiffs also allege that Marshall pressured Fort Bend ISD to settle with RHJ, citing meetings Marshall had with Fort Bend ISD administrators and his attendance at a Fort Bend ISD board meeting, but the meetings cited had to do with Fort Bend ISD's *initial hiring* of RHJ, not the resolution of the lawsuit. *See* Marshall Depo II. at 366-372; *but see* Marshall Depo. II at 374 (reporting no involvement with the settlement between RHJ and Fort Bend ISD). Throughout their brief, Plaintiffs frequently misstate the plain meaning of the evidence in similar ways and/or take it out of context when citing it.

Sometime around this time period, Plaintiffs allege that Ramirez had lunch with Ricardo Aguirre ("Aguirre"), the owner of a janitorial company that worked with HISD. Ramirez Aff. ¶ 11. At that meeting, Plaintiffs allege that Aguirre advised Ramirez that, if he wished to continue doing work for HISD, he had to hire Clay as a consultant. *Id.* Clay would pay Marshall, and Marshall would then use his influence to ensure GRG continued to get HISD projects. *Id.* However, in his deposition, Aguirre invokes the Fifth Amendment's protections against self-incrimination when asked if he has ever been involved in bribery schemes and specifically in bribery schemes involving Marshall. Deposition of Ricardo Aguirre at 34-35, Sept. 20, 2012 ("Aguirre Deposition"; Doc. No. 265-187). Ramirez did not hire Clay. Ramirez Aff. ¶ 11. From about September 2009, GRG received almost no new projects. *Id.*; *see* JOC Contract Data.

In the autumn of 2009, Marshall was campaigning for re-election. Medford, the owner of FBM, Medford's family, and FBM all made numerous campaign contributions to Marshall in the lead-up to the general election and during the subsequent run-off election. Candidate/Officeholder Campaign Finance Report for Lawrence Marshall (covering Jan. 16, 2009-July 15, 2009), Schedule A at 18-19 ("2009 Campaign Finance Report I"; Doc. No. 265-130); Candidate/Officeholder Campaign Finance Report for Lawrence Marshall (covering Sept. 25, 2009-Oct. 26, 2009), Schedule A at 1 ("2009 Campaign Finance Report II"; Doc. No. 265-157); Candidate/Officeholder Campaign Finance Report for Lawrence Marshall (covering Oct. 27, 2009-Dec. 4, 2009), Schedule A at 5 ("2009 Campaign Finance Report III"; Doc. No. 265-131); Candidate/Officeholder Campaign Finance Report for Lawrence Marshall (covering Jan. 16, 2010-July 1, 2010), Schedule A at 1 ("2010 Campaign Finance Report I"; Doc. No. 265-133); Check from David L. Medford to Larry Marshall for $25,000, Memo: "Campaign", Nov. 7,

2009 (Doc. No. 265-17). In total, these contributions amounted to $58,500.[4] Jackson also donated to Marshall's political campaigns. Jackson Depo. at 85.

In August 2009, HISD's internal auditor, John Gerwin ("Gerwin"), informed Robert Moore ("Moore"), HISD's Inspector General, that the list of contractors awarded JOC contracts in 2008 did not match the list recommended by the selection committee. Moore Depo. at 28-38. Based in part on this discrepancy, Gerwin conducted an audit of the procurement process that led to the 2008 JOC contract awards. *Id.* Gerwin's report found that (1) Lindsay's office unilaterally added GRG, FBM, Horizon, and Reytec to the list of JOCs recommended to the Board, bypassing the JOC contract procurement process without explanation or justification; (2) Lindsay's office never informed the Board that the list of contractors it submitted was not the list recommended by the selection committee, nor did it provide any documentation supporting its list; and (3) that those contractors that were added did not provide the best value for HISD. Audit Report: Review of the Supplemental Job Order Contractor Selection Process, Project No. 08-03-05, at HISD009030-31, Aug. 4, 2009 ("2009 Audit Report"; Doc. No. 253-9). Gerwin's report recommended voiding the 2008 contracts if Lindsay's office could not provide documentation that GRG, FBM, Horizon, and Reytec received JOC contracts in accordance with the Texas Education Code. *Id.* at HISD009031. Plaintiffs allege that the audit was a charade and point to negative, although general, evaluations of HISD's internal audit office from an independent agency, as well as from former HISD officials. *See* The Institute of Internal Auditors, *Internal*

---

[4] Plaintiffs allege several improprieties regarding Marshall's campaign finances. First, Medford's $25,000 contribution made on November 7, 2009 is not listed on the corresponding disclosure form. *See* Campaign Finance Report III. Second, Plaintiffs allege FBM subsequently reimbursed Medford for a $25,000 check he personally wrote to the campaign, thereby concealing a corporate campaign contribution, though they do not provide any support for this allegation other than counsel's assertion in their brief. Counsel reportedly saw the check, but has not received it in discovery. Pls.' Resp. at 59. Third, Plaintiffs allege that Marshall paid approximately $25,000 from his campaign through multiple checks written out to either "Larry Marshall" or "cash," and that these checks were not reported on Marshall's campaign finance reports. Checks from Campaign Bank Account Not Reported on Campaign Finance Reports From June 2009 Through July 2010 (Doc. No. 265-216).

*Audit Quality Assessment Presented To: Houston Independent School District*, July 2013 (Doc. No. 265-204); Deposition of Reginald Mack at 59-63, Oct. 25, 2012 ("Mack Deposition"; Doc. No. 265-169); Affidavit of Stephen M. Pottinger at 2-3, Feb. 11, 2013 ("Pottinger Affidavit"; Doc. No. 265-101). None of the criticisms is leveled specifically at Gerwin's 2009 JOC audit.

Based on Gerwin's report, Moore told the HISD Board's audit committee that the 2008 JOC contract procurement process may have violated state law, that he was considering reporting the matter for criminal prosecution, and that the contracts should not be renewed. This meeting occurred on January 11, 2010, shortly before the HISD Board was to vote on renewal of the JOC contracts. Moore Depo. at 44-54; Lindsay Decl. ¶ 6; Declaration of Robert Moore ¶ 5, July 31, 2013 ("Moore Declaration"; Doc. No. 250). In late 2009, the administration had prepared a recommendation to the Board to renew all existing JOC contracts, including GRG's. HISD Board members Rodriguez and Meyers had even informed Ramirez that GRG's contract would be renewed, as had Lindsay. Ramirez Decl. ¶ 13. However, at the January 2010 audit committee meeting, as a way to address Moore's concerns, Lindsay suggested rebidding the JOC contracts. Lindsay Decl. ¶ 6; Moore Decl. ¶ 5. After consulting with Moore and Lindsay, Dr. Terry Grier ("Grier"), HISD's new superintendent, decided to do just that. Grier removed the agenda item recommending renewal of all the JOC contracts. Declaration of Dr. Terry Grier ¶¶ 2-3, July 31, 2013 ("Grier Declaration"; Doc. No. 250-3); HISD Bd. of Educ. Meeting Agenda, Jan. 14, 2010 (excerpt) (Doc. No. 265-12).

HISD allowed all of the JOC contracts awarded as part of the 2008 process to expire at the end of 2009 and the beginning of 2010 (with the exception of RHJ, which has executed its one-year contract in the fall of 2009). *See* Email from Willie T. Burroughs to Jim Rice, et al., Jan. 12, 2010 (Doc. No. 253-20). In February 2010, HISD released a new Request for Proposals

for JOCs, and a selection committee was formed. 2010 Request for Proposals: Project No. 10-01-05, Job Order Contract Program for Repair, Rehabilitation, Minor Construction and alteration of Facilities ("2010 Procurement"; Doc. No. 253-21); Eaglin Depo. at 10-13. Thirteen contractors applied, including GRG, FBM, and RHJ. Email from Elvis Eaglin to Melinda Garret and Charles Morris, Apr. 9, 2010 (Doc. No. 265-69).

Senior procurement manager Elvis Eaglin ("Eaglin") consulted with various HISD departments about the amount of outstanding JOC work in order to determine the number of JOCs needed. Based on this, the committee determined to award four JOC contracts. Eaglin Depo. at 17-19. Using a ranking system similar to that employed in 2008 and determined largely by a pricing coefficient, the selection committee concluded that Jamail & Smith, KBR, RHJ, and FBM should be selected as JOCs. Project No. 10-01-05: Job Order Contract Program: Evaluation Form ("2010 JOC Evaluation Form"; Doc. No. 253-23); Eaglin Decl. ¶¶ 14-16. The recommendations were then presented to the Board at its May 2010 meeting, and the Board approved them by a vote of 7-1. HISD Bd. of Educ. Meeting Minutes at 8-9, May 13, 2010 (Doc. No. 245-3). Notably, GRG was ranked tenth out of thirteen. 2010 JOC Evaluation Form. RHJ rehired Clay days after learning that it had been selected as a JOC. *See* Letter from Clay to Jackson, Apr. 30, 2010 (Doc. No. 265-98). When GRG, Horizon International, and Reytec inquired as to why they were not selected, HISD informed them that the four selected JOCs were ranked higher because of a selection system that heavily weighted the pricing coefficient. Ramirez Decl. ¶ 16. Plaintiffs allege that this ranking system and JOC selection process were also charades because of their reliance on pricing coefficients, when the previous JOCs had agreed on a single coefficient, and because of what they view as "suspect" subjective evaluations of the applicants by the selection committee. Pls.' Resp. at 84-86.

Plaintiffs filed this suit in December, 2010. They allege that GRG lost project awards starting in September 2009, and failed to have its JOC contract renewed because it refused to bribe Marshall by hiring Clay for "an illusory consultant position." FAC ¶ 84. They contend that Clay served as a conduit for the payment of bribes by Medford, FBM, Jackson, and RHJ to Marshall, and these bribes were intended to influence Marshall's official acts in selecting JOCs and awarding jobs to JOCs. *Id.* ¶ 112. Clay, in turn, was left with twenty-five to thirty-five percent of the bribes "as consideration for her risk." *Id.* Plaintiffs also allege that the payments made to Marshall's campaign by Medford and FBM were also intended to influence Marshall's official acts in approving JOCs. *Id.* ¶¶ 62-66, 112. Marshall, in turn, allegedly accepted these various payments with the intent to use his position as an HISD trustee to influence the selection of JOCs. *Id.* ¶¶ 112, 117. GRG contends that it suffered substantial economic injury as a result of the decrease in JOC job assignments and not having its JOC contract renewed.  *Id.* ¶¶ 83-84.

Plaintiffs allege numerous violations of law by the defendants. The claims brought against HISD include violations of 18 U.S.C. §§ 1962(c) and (d) of the Racketeer Influenced Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961-1968 ("RICO Act"); violations of the Fourteenth and First Amendments, brought under 42 U.S.C. § 1983; and state law breach of contract/breach of duty of good faith, promissory estoppel, quasi-estoppel, and civil conspiracy claims. FAC ¶¶ 93-154, 169-74. In addition, Plaintiffs seek declaratory judgment and a permanent injunction against HISD. *Id.* ¶¶ 166-68, 175-78. The claims brought against the Marshall Defendants are similar. They include the same RICO Act and constitutional allegations, as well as the state law torts of tortious interference with prospective contract, tortious interference with existing contract, and civil conspiracy. *Id.* ¶¶ 93-135, 155-65, 169-74. Those

brought against Clay and/or JM Clay include the RICO Act claims and the state law torts of tortious interference with existing contract and civil conspiracy. *Id.* ¶¶ 104-35, 161-65, 169-74.

This Court has decided two previous motions to dismiss by RHJ, FBM, and related defendants. *See* Doc. Nos. 179, 229. By the pending motions, HISD, the Marshall Defendants and Clay seek summary judgment as to all of the claims leveled against them. HISD has also filed two motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), or, alternatively, Rule 12(c), in which it seeks dismissal of the RICO Act claims and the state law tort claims.

## II.    MOTION TO DISMISS[5]

### A.  Legal Standard

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d. 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id.* Thus, a pleading need

---

[5] HISD has filed a motion to dismiss the RICO Act claims against it. *See* Doc. No. 241. However, HISD has incorporated those arguments into its motion for summary judgment. *See* HISD's Mot. at 14. Accordingly, the Court will consider them along with the rest of HISD's summary judgment arguments.

not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 556 U.S. at 678-79 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). A court may consider the contents of the pleadings, including attachments thereto, as well as documents attached to the motion, if they are referenced in the plaintiff's complaint and are central to the claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

Nevertheless, a court may not assume that a plaintiff can prove facts that were not alleged. *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir. 1986). Indeed, dismissal is appropriate where the complaint "lacks an allegation regarding a required element necessary to obtain relief." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted). Even so, "[m]otions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)).

A motion for judgment on the pleadings under Rule 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation omitted). In deciding a Rule 12(c) motion, courts are to apply the same standard as that used in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

### B.  Discussion

By this motion, HISD seeks dismissal of Plaintiffs' state common law tort claims against Marshall as barred by the election of remedies provisions of the Texas Tort Claims Act ("TTCA"), Tex. Civ. Prac. & Rem. Code §§ 101.001-101.109. *See* Doc. No. 244 at 2-4. The relevant statute, Section 101.106(e) of the Texas Civil Practice and Remedies Code, requires: "If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Thus, "[o]nce the governmental unit files a motion to dismiss the claims against its employee under section 101.106(e), the trial court must grant the motion and dismiss the claims against the employee from the suit." *Cooper v. City of Plano*, No. 4:10–CV–689, 2011 WL 4100721, at *9 (E.D. Tex. Aug.19, 2011). Section 101.106(e) is not limited to tort claims for which the TTCA waives immunity; rather, "because the TTCA [is] the only avenue for common-law recovery against a governmental unit, all tort claims against such units [are] assumed to be 'under this chapter' for purposes of § 101.106." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 463 (5th Cir. 2010) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658–59 (Tex. 2008)). Therefore, "if a plaintiff brings virtually any state common law tort claim against both a

17

governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." *Id. See Freeman v. City of Fort Worth, Tex.*, No. 4:10–CV–888–Y, 2011 WL 2669111, at *10 (N.D. Tex. July 7, 2011); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. H-12-1047, 2012 WL 6096675, at *4-*6 (S.D. Tex. Dec. 7, 2012); *Olvera v. Alderete*, No. 4:10-CV-2127, 2010 WL 4962964, at * 14 (S.D. Tex. Dec. 1, 2010).

HISD argues that Plaintiffs' three state tort claims against Marshall – tortious interference with existing contract, tortious interference with prospective contract, and civil conspiracy – should be dismissed pursuant to the TTCA. HISD acknowledges that only the civil conspiracy claim is brought against *both* HISD and Marshall, but contends that the other two state tort claims should be dismissed as well because they are "rooted in the same alleged common law violations," just like the claims that the *Bustos* court dismissed. 599 F.3d at 464.

The Court is persuaded that dismissal of the civil conspiracy claim as to Marshall is required under the TTCA. In Texas, civil conspiracy is a common law intentional tort. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933–34 (Tex. 1983); *Dorward v. Ramirez*, No. 3:09-CV-0018-D, 2009 WL 2777880, at *13-*16 (N.D. Tex. Aug. 28, 2009). Thus, the Court must consider the civil conspiracy claim as "a suit filed under" the TTCA. Accordingly, because Plaintiffs sued both HISD and Marshall for civil conspiracy, upon motion by HISD, this Court must dismiss the claim against Marshall. HISD's motion is granted with respect to the civil conspiracy claim.

The other state common law torts Plaintiffs bring against Marshall require a different analysis because the complaint is clear that Plaintiffs are bringing them only against Marshall, in his individual capacity, and not HISD. FAC ¶¶ 155-165. HISD, relying on the Fifth Circuit's *Bustos* decision, argues that they also should be dismissed. The plaintiff in *Bustos* brought state

common law intentional tort claims against several San Antonio police officers following a fight at a night club. The plaintiff in that case also brought a negligent hiring and supervision claim against the City of San Antonio. The Fifth Circuit concluded that the plaintiff clearly did bring a negligent hiring and supervision claim against the City "that is rooted in the same alleged common law violations" as the officers' intentional torts. *Bustos*, 599 F.3d at 464. On this basis, the Fifth Circuit upheld the district court's dismissal of the claims against the officers under the TTCA. *Id.* HISD claims that here, similarly, the civil conspiracy claim brought against both HISD and Marshall is "rooted in" the same state law torts brought against Marshall alone, and therefore the dismissal required by the TTCA should extend to these claims as well. *See* Doc. No. 244 at 3-4.

Plaintiffs respond that the civil conspiracy claim is not, in fact, "rooted in" the same torts brought against Marshall. They argue that the Fourth Amended Complaint reveals that the civil conspiracy claim concerns the allegations of constitutional violations, and not the state law torts brought against Marshall. Only the constitutional violations, they contend, are alleged against *both* Marshall and HISD and therefore the civil conspiracy claim can be considered to be "rooted in" those constitutional allegations alone. Doc. No. 260 at 5-7. HISD replies that, by its text, the civil conspiracy claim is not limited to the constitutional claims.

Plaintiffs' argument misunderstands the operation of a conspiracy. Under Texas law, the elements of civil conspiracy are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts in furtherance of the conspiracy; and (5) damages as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). While the "unlawful act" underlying a civil conspiracy claim may be the Section 1983 violations alleged here, allegations concerning the underlying act need not be

brought against all the members of a conspiracy; it is enough that the members of the conspiracy agree on their course of action and effectuate that course of action through one or more unlawful acts. Thus, hypothetically speaking, all of the members of the conspiracy alleged here could have agreed that Marshall would undertake actions to tortiously interfere with Plaintiffs' prospective contract. If Marshall did, a claim for civil conspiracy could still lie, while there may or may not be tortious interference with prospective business relations claims against the other members of the conspiracy. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979) ("civil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned assisted, or encouraged his acts.'") (quoting W. Prosser, *Handbook of the Law of Torts* § 46, at 293 (1971)).

Though Plaintiffs' briefing misunderstands this basic fact regarding conspiracy claims, their complaint does not: when bringing their civil conspiracy claim, Plaintiffs allege that "[o]ne or more of the members [of the conspiracy] committed an unlawful act, overt act [sic] to further the object or course of action." FAC ¶ 173. However, in their Fourth Amended Complaint, this is all that Plaintiffs state directly regarding the "unlawful act" underlying their conspiracy claim. Therefore, without any specification or limitation in Plaintiffs' complaint regarding the nature of the civil conspiracy, the Court has no choice but to read Plaintiffs' civil conspiracy claim as encompassing *all* of the unlawful acts alleged by Plaintiffs in this case. Therefore, insofar as the civil conspiracy claim against HISD arises under the state law tortious interference claims against Marshall, it is "rooted in" the same common law violations as those tortious interference claims. Accordingly, the tortious interference with existing contract and with prospective contract claims against Marshall must be dismissed pursuant to the TTCA as well.

### III.   MOTIONS FOR SUMMARY JUDGMENT

#### A.  Legal Standard

Under Rule 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Importantly, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis v. Roche Biomed. Lab.*, 61 F.3d 313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of the suit under the governing law . . . ." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). A court may consider any evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shafer v. Williams*, 794 F.2d 1030, 1033 (5th Circ. 1986); see Fed. R. Civ. P. 56(c)(4).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322-23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case." *Celotex*, 477 U.S. at 325. However, "[i]f the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

Once the moving party has met its burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Neither will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

B.  **The RICO Act Claims**

The Racketeer Influenced and Corrupt Organizations Act imposes criminal and civil liability upon those who engage in "a pattern of racketeering activity." *See* 18 U.S.C. § 1961(1). The RICO Act was enacted to fight corruption; it is intended to "both protect[] a legitimate 'enterprise' from those who would use unlawful acts to victimize it, and also protect[] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful . . . activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001) (internal citations and quotations marks omitted).

All of the RICO Act's subsections[6] "have three common elements: '1) a *person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an *enterprise*.'" *Real Estate Innovations, Inc. v. Houston Ass'n of Realtors, Inc.*, 422 F. App'x 344, 350 (5th Cir. 2011) (quoting *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995)). In order to bring suit under the RICO Act, the statute requires that a person must be "injured in his business or property" by the alleged RICO Act violation. 18 U.S.C. § 1964(c). A party so injured who successfully proves liability under the RICO Act "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

Citing the decisions of other district courts within the Fifth Circuit, HISD argues that it is not a proper RICO Act defendant for two reasons. First, as a municipal corporation, it argues that it is incapable of formulating the *mens rea* required to support RICO Act violations. Doc. No. 241 at 2-3. Second, HISD claims that the RICO Act's treble damages can only be considered punitive. It argues that this also requires dismissal because it is a municipal corporation and therefore is immune from such punitive damages. *Id.* at 3. In addition, citing various legal and factual grounds, HISD, the Marshall Defendants, and Clay all argue that summary judgment is warranted as to Plaintiffs' RICO Act claims. The Court need not decide whether HISD is a proper RICO Act defendant, nor need it address the majority of the defendants' summary

---

[6] Plaintiffs bring claims under 18 U.S.C. §§ 1962(c) and (d). The RICO Act provides in relevant part:

> **(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> **(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(c)-(d).

judgment arguments because the Court is persuaded that the plaintiffs lack standing to sue under the RICO Act.

RICO Act standing in the Fifth Circuit requires a tangible financial loss and Plaintiffs have not shown such an injury. The Fifth Circuit has clearly and unequivocally held that an "[i]njury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) (citing *In re Taxable Mun. Bond Secs. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) ("[S]peculative damages are not compensable under RICO."). Instead, a plaintiff must demonstrate a "conclusive financial loss" in order to have standing to bring a civil claim under RICO. *Id.*

Here, Plaintiffs complain that they suffered a drop in JOC job assignments in 2009, and their JOC contract was not renewed in 2010. However, by its express terms, GRG's JOC contract neither guaranteed it *any* jobs whatsoever, nor renewal following the expiration of its one-year term. 2008 JOC Contract at Arts. 2, 14, 15. Thus, any injury can only be the loss of an expectation interest and therefore speculative – the very kind of injury the Fifth Circuit has determined is insufficient to confer RICO Act standing.

Plaintiffs respond by arguing that the *fact* of some amount of damages must be certain, but it is acceptable, at the summary judgment stage, if the *scope* of damages is uncertain. That may very well be, but, on its own terms, even the fact of damages is *not* certain here. It is undisputed that Plaintiffs' JOC job assignments dropped around September, 2009. It is also undisputed that Plaintiffs' JOC contract was not renewed in 2010. But, Plaintiffs had no entitlement to *any* JOC job assignments, nor were they entitled to have their contract extended beyond one year. 2008 JOC Contract at Arts. 2, 14, 15. Plaintiffs nowhere contest these basic facts; they merely assert that they were assured by two trustees and a high-level administrator

that their contract would be renewed. These assurances, though, were made before it was revealed to the HISD Board's audit committee that that same high-level administrator had bypassed the JOC contract procurement process unilaterally to award GRG with a contract in the first place. Plaintiffs have not presented facts sufficient to demonstrate the kind of concrete business damages the Fifth Circuit requires before it will entertain RICO Act claims.

Perhaps trying to head off arguments about speculative damages, Plaintiffs also submit to the Court an expert damages report. Declaration of T. Ransom Cornish, Dec. 13, 2012 ("Cornish Report"; Doc. Nos. 265-42—265-63). HISD and Marshall object to the Court's acceptance of this report, *see* Motion to Exclude Expert Witness (Doc. No. 272), but the report too does not challenge the expectant nature of the damages it purports to outline. For example, the Cornish Report confirms that the plaintiffs' damages are merely expectancy interests, stating that "it is *reasonable to expect* that GRG would have made an additional $1,411,000 gross profit during 2011," had the contract been renewed. Cornish Report ¶ 15 (Doc. No. 265-43) (emphasis added). Plaintiffs simply offer no evidence of the kind of tangible financial loss the Fifth Circuit requires for RICO Act standing. Consequently, Defendants are entitled to judgment as a matter of law, and summary judgment as to all of the RICO Act claims is warranted.

### C. The Constitutional Claims

Plaintiffs also seek damages under 42 U.S.C. § 1983 for violations of their First and Fourteenth Amendment rights. Plaintiffs claim that HISD and Marshall improperly terminated their rights under the JOC contract without good cause or due process, in violation of the Fourteenth Amendment's protection against the deprivation of liberty or property without due process. FAC ¶¶ 94-96. Plaintiffs also allege that HISD and Marshall violated the Fourteenth Amendment by depriving them of the equal protection of the law, though the mechanism of that

deprivation is not clear from the complaint. *See id.* at ¶ 98. The plaintiffs also allege that HISD and Marshall violated their First Amendment rights. *Id.* at ¶¶ 96-97. Plaintiffs allege that they were injured by HISD and Marshall when they refused to "politically associate and politically support" Marshall by making payments to him or his political campaigns. *Id.* at ¶ 97.

The Civil Rights Act of 1871, 42 U.S.C. § 1983, creates a private right of action to redress the violation of federal rights by those acting under color of state law. *Tex. Manufactured Hous. Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1106 (5th Cir. 1996). Section 1983 is not a source of substantive rights, but rather "merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)). To prevail on a Section 1983 claim, then, a plaintiff must prove that a person acting under color of state law deprived her of a right secured by the Constitution or the laws of the United States. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999); *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). As a municipal entity and a public official, respectively, both HISD and Marshall claim a variety of defenses to and immunity from certain constitutional claims.[7] Plaintiffs offer a scattershot set of arguments by which this Court could hold them liable. The Court need not resolve the various liability issues, however, for each of their constitutional claims fails as a matter of law. As explained below, Plaintiffs cannot establish any constitutional violations. Consequently, even if

---

[7] Marshall invokes the affirmative defense of qualified immunity. Marshall's Motion at 62-65. As is explained below, Plaintiffs do not show the violation of any clearly established federal constitutional rights. Therefore, the Court need not consider the remainder of the qualified immunity analysis. *See Nunez v. Simms*, 341 F.3d 385, 387 (5th Cir. 2003) (citing *Martinez v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 576–77 (5th Cir. 2002)). Because Plaintiffs cannot establish any constitutional violations, they cannot defeat Marshall's invocation of qualified immunity.

Plaintiffs could establish liability, summary judgment is warranted as to all of Plaintiffs' constitutional claims against both HISD and Marshall.

### 1.  Due Process Claim

Plaintiffs' first constitutional claim is that HISD and Marshall violated their procedural due process rights in terminating the JOC contract. This claim fails for much the same reason that Plaintiffs' RICO Act claims fail: the JOC contract, by its own, unequivocal terms, provided that renewal was solely at the pleasure of HISD. On these facts, Plaintiffs cannot maintain that they even have a property interest protected by the Fourteenth Amendment. Their lack of such an interest is fatal to their due process claim.[8]

Procedural due process rights attach only when a plaintiff first establishes the existence of a protected liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Schaper v. City of Huntsville*, 813 F.2d 709, 713 (5th Cir. 1987). Protected property interests are found not in the Constitution, but in independent sources, such as state or local law. *Roth*, 408 U.S. at 578; *Schaper*, 813 F.2d at 713. If a plaintiff can show the denial of a protected property interest, a court must consider what process the defendant provided and whether it was adequate. *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 220 (5th Cir. 2012); *Meza v. Livingston*, 607 F.3d 392, 401–02 (5th Cir. 2010).

Here, the Court need not inquire as to whether the process provided was adequate, for Plaintiffs have not shown that they have a protected liberty or property interest. Plaintiffs continue to maintain that their JOC contract was terminated, despite the Court's rejection of that

---

[8] In addition to a procedural due process claim, Plaintiffs' Fourth Amended Complaint could be read to be making a substantive due process claim as well, because their constitutional claims relate to "deprivation of certain procedural and *substantive* rights, i.e., life, liberty and property, without constitutionally adequate procedures." FAC ¶ 94 (emphasis added). In seeking summary judgment, both HISD and Marshall attack possible substantive due process arguments. Plaintiffs, though, do not respond to the summary judgment motions on this substantive due process issue – they point to no evidence, nor do they offer any legal argument to counter HISD's and Marshall's challenges. Thus, the Court will consider any substantive due process claim abandoned.

argument. *See* Doc. No. 179 at 25. The uncontestable evidence is that GRG's JOC contract was not terminated; it expired after its one-year term, and was not renewed by HISD. Plaintiffs make out something of a "constructive termination" theory, positing that, because they received fewer JOC jobs while their contract was still in effect, the contract was effectively terminated. Pls.' Resp. at 186-87. However, the uncontestable language of the JOC contract makes clear that the awarding of JOC jobs was purely at HISD's discretion. 2008 JOC Contract at Arts. 2, 14, 15; *see* Doc. No. 179 at 25-26. In fact, Plaintiffs concede as much, labeling such a reading of the contract as "technically correct." Pls.' Resp. at 186. The JOC contract provided Plaintiffs no guarantee of jobs, even a minimal number. 2008 JOC Contract at Arts. 2, 14. In addition, the contract did not provide for automatic renewal. *Id*. at Arts. 14, 15. Rather, renewal too was solely at the discretion of HISD. *Id.*

Though Plaintiffs concede that they did not have a property interest in GRG's JOC contract renewal, Pls.' Resp. at 186, they contend that they were led to believe that the contract would be renewed by HISD Board members Rodriguez and Meyers and HISD administrator Lindsay. They also, for the first time, argue that the prevailing "custom" was that that GRG would somehow share in the JOC job assignment through some undefined "rotation" scheme. *Id.* at 186-87. None of this is included in the JOC contract, however, and Plaintiffs do not supply or point to any other evidence that created even an informal contract or other property interest. Just as it does not suffice for RICO Act standing, a mere expectancy interest does not create a liberty or property interest protected by the Fourteenth Amendment. *Perry v. Sindermann*, 408 U.S. 593, 602-03, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); *Nunez v. Simms*, 341 F.3d at 391. Lacking a protected liberty or property interest, the Court must reject Plaintiffs' due process claim.

28

## 2.  First Amendment Claim

Next, Plaintiffs allege that they were injured by HISD and Marshall when they refused to "politically associate and politically support" Marshall by making payments to him or his political campaigns. FAC ¶ 97. If this were true, Plaintiffs might have a First Amendment claim. However, Plaintiffs do not offer facts to support this contention. Rather, the evidence Plaintiffs offer is that Ramirez was approached by Aguirre, who explained to Ramirez that if he wanted keep his HISD contract, he should pay Clay, who would pay Marshall, who would use his influence to benefit GRG. Additionally, Plaintiffs present evidence that Aguirre also had meetings with Marshall at about the same time, leading to the possible inference that Aguirre was acting as a messenger for Marshall. Marshall Calendar entries, Aug and Sept. 2009 (Doc. Nos. 265-149, 265-150). HISD and Marshall object to the evidence Plaintiffs offer regarding Aguirre's statements. *See* Objections to Plaintiffs' Summary Judgment Evidence (Doc. No. 277). Marshall also points out that, when questioned about whether he participated in a scheme to bribe Marshall for HISD contracts, Aguirre invoked the protection against self-incrimination provided by the Fifth Amendment. Aguirre Depo. at 34-35. The Court will assume without deciding that these allegations are true because, even on these facts, taken in the light most favorable to Plaintiffs, Plaintiffs' First Amendment claim fails.

In their Response to the summary judgment motions, Plaintiffs attempt to fill out their First Amendment theory. They argue that they "clearly understood that they were to pay if they wanted to play, but they refused to pay, and, as a result, their existing contract was effectively terminated because they were removed from the rotation for job assignments thereunder. Moreover, Plaintiffs [sic] refusal to pay lead [sic] to GRG losing its three year contract and being cast aside when the JOC contracts were reissued in 2010." Pls.' Resp. at 141.

A First Amendment claim requires speech or some other expressive conduct that is properly characterized as protected by the First Amendment. A plaintiff bringing a First Amendment retaliation claim such as this "must (1) show that his speech was constitutionally protected, i.e., that it involved a matter of public concern; (2) that his interest in commenting on the matters of public concern outweighs the public employer's interest in promoting efficiency; and (3) that his speech was a motivating or substantial factor in the termination decision." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 108 (5th Cir. 1997) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). *See Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.*, 463 F.3d 378, 382 (5th Cir. 2006). The Supreme Court has been clear: speech is not constitutionally protected if it is solely personal or job-related; it must relate "to a matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Plaintiffs' claim founders because they point to no protected speech or expressive conduct.

In this arena, the Fifth Circuit has exacting standards. "For activities to constitute expressive conduct and fall within the scope of the First Amendment, they must be 'sufficiently imbued with elements of communication.'" *Cabrol*, 106 F.3d at 109 (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974)). In resolving this question, the Fifth Circuit asks "whether an intent to convey a particularized message was present and whether the likelihood was great that the message would be understood by those who viewed it." *Id.* (citing *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); *United States v. Hayward*, 6 F.3d 1241, 1249 (7th Cir. 1993), *cert. denied*, 511 U.S. 1004, 114 S. Ct. 1369, 128 L. Ed. 2d 46 (1994)). In other words, "[i]n order for a message to be delivered by conduct, it must, in context, be reasonably apprehended by viewers." *Id.* (citing

*Spence*, 418 U.S. 405; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969); *Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 995 (3rd Cir.), *cert. denied*, 510 U.S. 824, 114 S. Ct. 85, 126 L. Ed. 2d 53 (1993)). This requires an examination of the activity in question, "combined with the factual context and environment in which it was undertaken." *Id.* (citing *Spence*, 418 U.S. at 409-10; *Steirer*, 987 F.2d at 995).

In *Cabrol*, Mr. Cabrol, who raised "fighting chickens," claimed that he was fired from his municipal job because he objected to an amendment to the town's nuisance ordinance proposed by the mayor. The amendment would have added provisions which Mr. Cabrol believed would have adversely affected his ownership of chickens. The amendment was tabled after others raised concerns about it, and it was never adopted. The mayor later informed Mr. Cabrol that his municipal employment would be terminated if he did not remove the chickens from his yard. Mr. Cabrol did not remove the chickens and was fired. 106 F.3d at 104.

The district court granted summary judgment and the Fifth Circuit affirmed. Mr. Cabrol had alleged a number of claims, one of which was retaliation for protected speech, just as Plaintiffs allege here. Mr. Cabrol argued that his refusal to rid his yard of the chickens following the mayor's request and his attendance at a prior city council meeting amounted to expressive conduct protected by the First Amendment. *Cabrol*, 106 F.3d at 109. The Fifth Circuit rejected Mr. Cabrol's contention, reasoning that "[t]here was no likelihood, that Cabrol's activity, combined with its context and environment, communicated a message to his viewers. Cabrol was not doing anything that he had not been doing previously. His continued maintenance of the chickens in his yard did not occur in the context of, for example, any accompanying conduct or symbol." *Id.* (internal citation omitted). Moreover, "there [was] no allegation that either the proposed amendment or the mayor's request had entered the public consciousness." *Id.* Based on

these facts, the court concluded that "[t]here was no context that would allow the continued residence of the chickens in Cabrol's yard to resonate a message to viewers that Cabrol opposed the proposed ordinance amendment." *Id.* Without any likelihood of apprehension by any viewers, the court found that there was no expressive conduct that could be protected by the First Amendment. *Id.*

Here, according to Plaintiffs, Ramirez was approached by Aguirre and was informed that he should pay in order to keep his HISD contract; payment was neither asked of nor demanded from him. Ramirez refused. Whether he did so in an oral statement or not, the operative fact, for the purposes of retaliation in violation of the First Amendment, is that, subsequently, he did not pay either Clay or Marshall. *Cabrol* is directly on point. First, and most fundamentally, Plaintiffs do not present evidence that Ramirez had any "intent to convey" any particular protected message by his "refusal" to pay a bribe. On that ground alone the claim fails. Nor do they present evidence that anybody at all would have "reasonably apprehended" such a protected message in GRG's refusal to pay Marshall. As in *Cabrol*, for instance, Plaintiffs were "not doing anything that [they] had not been doing previously." 106 F.3d at 109. Moreover, just like *Cabrol*, the refusal to pay a bribe "did not occur in the context of, for example, any accompanying conduct or symbol." *Id.* On this ground too the claim falters. Further, Plaintiffs present insufficient evidence that, at that time, accusations of bribery at HISD "had entered the local public consciousness" such that Ramirez's refusal could have been taken as communicating a protected message. *Id.* Plaintiffs offer evidence of a scandal at HISD concerning improper gifts, which was first uncovered in 2005. This is not sufficient, however, to create a "factual context and environment" in which Ramirez's private refusal to pay Clay as Aguirre instructed in 2009 would have reasonably been apprehended as anything other than a private business arrangement.

Plaintiffs rely heavily upon *Wabaunsee County Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996) and *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996), which they characterize as directly on point, but here Plaintiffs are mistaken. These cases concern political campaign contributions and public political criticism, which are clearly protected expressive conduct. *See Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). Apart from Plaintiffs' unsupported assertions that the bribes Ramirez was to pay were to be campaign donations, there simply is no evidence that Ramirez's "refusal" to pay a bribe had any connection to any political campaigns or any political meaning whatsoever. Therefore, the cases cited by Plaintiffs simply do not address the salient issue here. In fact, the cases upon which Plaintiffs rely for support of their First Amendment claim are based upon political contributions or similar political speech, except for *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378 (5th Cir. 2006). But this case is of no assistance either. The protected activity at issue in *Oscar Renda Contracting* was a lawsuit against the City of San Antonio; the question was not whether such activity was protected at all, which is the issue here, but whether a lawsuit against the City of San Antonio was of public concern in Lubbock. *Id.* at 381-83.

Plaintiffs argue that, "whatever its role, any matter involving a bribery scheme by a public official obviously, and by definition, touches on a matter of public concern. Similarly, any matter involving the expenditure of millions of dollars in public funds touches on a matter of public concern." Pls.' Resp. at 144 (internal citation omitted). This may be true, but it concerns merely the *content* of the speech and ignores the related question of whether the *nature* of the speech or conduct is such that it can fairly be considered protected by the First Amendment.

Following the Supreme Court's directive in *Connick v. Myers*, the Fifth Circuit has determined that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Oscar Renda Contracting*, 463 F.3d at 382 (quoting *Connick v. Myers*, 461 U.S. at 147-48). Here, the content is clearly public. *See, e.g.*, *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . concerns matter of public import.") (quoting *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990)). The form and context, however, are private: according to Plaintiffs, Ramirez refused to pay any money to Clay or Marshall in a private business meeting with Aguirre, and, subsequently, neither he nor GRG did. Plaintiffs cite *McGreal v. Ostrov*, 368 F.3d 657, 674 (7th Cir. 2004), but this case too is unavailing. It does support the uncontroversial notion that government employee speech about public corruption can fairly be considered a matter of public concern, but it dealt with *complaints* of public corruption in official law enforcement memoranda. By contrast, here, Plaintiffs provide no evidence that, in refusing to pay bribes, they were "seek[ing] to bring to light actual or potential wrongdoing or breach of public trust." *Connick v. Myers*, 461 U.S. at 148.

Plaintiffs neither cite evidence to show that they suffered retaliation because of their engagement in behavior protected by the First Amendment, nor legal authority that would relieve them of that burden. Consequently, summary judgment as to the First Amendment claims is warranted.[9]

_____

[9] At times in their Response, it appears as though Plaintiffs may be making a compelled speech argument. HISD and Marshall both argue that there is no evidence of compulsion by either of them. Leaving this objection to one side, at the very least, as explained above, this case simply does not involve speech protected by the First Amendment. The leading compelled speech cases, *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) (finding compelled speech in violation of the First Amendment in New Hampshire's required "Live Free or Die" license plate motto) and *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) (finding compelled speech in violation of the First Amendment in a requirement that schoolchildren recite

### 3.  Equal Protection Claim

Finally, Plaintiffs argue that HISD and Marshall violated their Fourteenth Amendment right to the equal protection of the laws. Again, it is absolutely unclear from the complaint exactly how it is that Plaintiffs believe that HISD and Marshall deprived them of their equal protection rights. FAC ¶ 98 ("HISD and Marshall, in his official capacity, also failed to give Ramirez and GRG equal protection under the law."). Their Response is more illuminating, however. In it, they argue that they were discriminated against in the assignment of JOC jobs because they did not pay bribes to Marshall. In other words, they argue that similarly situated contractors who paid bribes were treated better and received more JOC jobs than they did, simply because these other contractors paid bribes, while Plaintiffs did not. Pls.' Resp. at 146-47.

Whatever else it might encompass, a cornerstone of equal protection analysis is intentional discrimination "'because of,' not merely 'in spite of'" a particular characteristic. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). *See Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001) (quoting *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988)); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 687-88 (10th Cir. 2012) ("To make out an equal protection violation in these circumstances, SECSYS must point to evidence that the defendants enforced their extortionate rule with the purpose of discriminating against those who wouldn't comply—because of, not in spite of, its disparate effect on that class of persons."). This, however, is something Plaintiffs do not show, and for that reason, their equal protection claim cannot survive summary judgment. Plaintiffs simply have not adduced any evidence to demonstrate that Marshall or others engaged in the alleged bribery scheme *because*

---

the Pledge of Allegiance and salute the flag) concerned governmental units requiring individuals to make, or adopt, certain ideological messages or viewpoints. By contrast, as in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, "[t]here is nothing in this case approaching a Government-mandated pledge or motto" that Plaintiffs "must endorse." 547 U.S. 47, 62, 126 S. Ct. 1297, 1308, 164 L. Ed. 2d 156 (2006). Thus, if Plaintiffs do indeed put forth a compelled speech argument, it too must fail.

*of* and not *in spite of* its adverse effects on the non-bribing contractors. Indeed, from what evidence Plaintiffs do provide, even taken in the light most favorable to Plaintiffs, the most that can be said is that Marshall, if he did participate in a bribery scheme, did so to enrich himself, not as a way to discriminate against non-paying contractors. Without this central evidence, an equal protection claim cannot hold. HISD and Marshall are entitled to summary judgment as to this claim as well.

### D.  State Law Claims against HISD

Plaintiffs bring a hybrid breach of contract/breach of duty of good faith claim against HISD, as well as promissory estoppel, quasi-estoppel, and civil conspiracy claims, all under Texas state law. These claims fare no better than the others; for the reasons set forth below, summary judgment is warranted regarding each of these claims too.

### 1.  Breach of Contract/Breach of Duty of Good Faith Claim

Plaintiffs first bring an intriguing amalgam: breach of contract/breach of duty of good faith. FAC ¶¶ 136-142. Under this claim, Plaintiffs make three allegations: 1) "HISD's breach of contract included failing to make payments for work performed as required under the terms of the contract," FAC ¶ 139; 2) "HISD's breach of contract included failing to comply with contract terms regarding the term of the agreement and extensions of same," FAC ¶ 140; and 3) "HISD's breach of contract included failing to adhere to the contract terms in compliance with HISD's duty of good faith and fair dealing," FAC ¶ 141. Plaintiffs clarify in their response that they are not bringing an independent breach of duty of good faith, but are simply bringing "one claim with interlocking components" and arguing that "HISD's breach of contract included failing to adhere to the contract terms in compliance with its duty of good faith and fair dealing." Pls.' Resp. at 153.

36

Breach of contract has the following elements in Texas: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages to the plaintiff resulting from the breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)); *Sauceda v. GMAC Mortg. Corp.*, 268 S.W.3d 135, 140 (Tex. App.— Corpus Christi 2008, no pet.).

The Texas Supreme Court has "specifically rejected the implication of a general duty of good faith and fair dealing in all contracts." *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000) (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 n.5 (Tex. 1992). Under Texas law, "[o]nly in limited circumstances where there exists a 'special relationship' between the parties—as between insurers and insureds, principal and agent, joint venturers and partners–will the duty apply." *Hall v. Resolution Trust Corp.*, 958 F.2d 75, 79 (5th Cir. 1992) (internal quotation marks and citations omitted). Apart from such a special relationship, Texas implies a duty of good faith only in contracts governed by the Texas Uniform Commercial Code. *See Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 480-81 (Tex. App.— Corpus Christi 1989, writ denied). Plaintiffs recognize the limited extent to which Texas law will imply a duty of good faith fair dealing, and concede that there is no special relationship creating a duty of good faith here. Pls.' Resp. at 153-54.

The Court will consider the first allegation, about HISD's alleged "fail[ure] to make payments for work performed as required under the terms of the contract," as abandoned. *See* FAC ¶ 139. HISD moved for summary judgment regarding the claim and presented evidence that the allegedly unpaid invoices had in fact either been paid or had never been properly presented to HISD. HISD's Mot. at 63-64. Plaintiffs did not respond to these claims, either with evidence or

with legal argument. The Court is satisfied that HISD has established that there are no genuine issues of material fact with respect to this allegation, and that HISD is entitled to judgment as a matter of law. Thus, summary judgment as to this first allegation is warranted.

Regarding the remaining allegations, HISD persuasively argues that, on the terms of the GRG's JOC contract, there has been no breach, and therefore, Plaintiffs do not present evidence to establish the third element of breach of contract. The core of HISD's argument is that the JOC contract guaranteed neither a minimum number of JOC job assignments nor its own renewal. Thus, HISD argues, any claim Plaintiffs make that HISD breached the contract by not awarding certain JOC jobs or by not renewing the contract must fail. HISD's Mot. at 62-63.

Plaintiffs respond that HISD breached an implied duty of good faith and fair dealing in not awarding certain JOC jobs and not renewing the JOC contract. In support of this contention, they cite *Mailing & Shipping Systems, Inc. v. Neopost USA, Inc.*, but that case is unavailing. 937 F. Supp. 2d 879 (W.D. Tex. 2013). It concerns distributorship agreements, and discusses the existence of such a duty *in those agreements only*, according to the Texas Uniform Commercial Code. As this contract is not governed by the Texas Uniform Commercial Code, Plaintiffs cannot claim legitimately that such a duty exists here. With no support in Texas precedent, Plaintiffs' attempt to link a breach of duty of good faith to their breach of contract claim occupies very unstable ground. The Court sees no reason to imply a duty of good faith under Texas law.

Further, Plaintiffs argue that the JOC contract granted Plaintiffs a right to seek individual JOC jobs, and that HISD effectively denied this right once GRG refused to pay any bribes. In so doing, Plaintiffs argue, HISD breached both the JOC contract and its duty of good faith to give effect to the promises made in the contract. Pls.' Resp. at 155-56. However, Plaintiffs put forward no evidence that HISD ever denied GRG any opportunity to apply for JOC jobs, ever

prevented GRG from doing so, or ever interfered with GRG's attempts to do so. Plaintiffs are correct that a party to a contract "cannot 'hinder, prevent, or interfere with [another's] ability to perform [its] duties under [the] agreement.'" *SP Terrace, L.P. v. Meritage Homes of Texas, LLC*, 334 S.W.3d 275, 285 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 435 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). However, Plaintiffs simply do not provide evidence demonstrating that HISD ever did "hinder, prevent, or interfere with" GRG's ability to perform its contractual obligations. Summary judgment is warranted as to Plaintiffs' breach of contract/breach of duty of good faith claim.

### 2.  Promissory Estoppel and Quasi-Estoppel Claims

Plaintiffs offer their promissory estoppel and quasi-estoppel claims as alternative theories of liability should the Court reject their breach of contract claim. FAC ¶¶ 143-154. Because the Court has determined that Plaintiffs' breach of contract claim cannot survive summary judgment, the Court will consider these claims. HISD argues that, as a governmental unit, it is not subject to estoppel claims at all.

As a general matter, the Texas Supreme Court has concluded that a governmental body is "subject to estoppel only when acting in its proprietary capacity; when exercising governmental powers, it is not subject to estoppel." *Favero v. Huntsville Indep. Sch. Dist.*, 939 F. Supp. 1281, 1295-96 (S.D. Tex. 1996) (citing *Leeco Gas & Oil Co. v. County of Nueces*, 736 S.W.2d 629, 630 (Tex. 1987); *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835 (Tex. 1970)). Further, there is clear Texas authority that independent school districts can *only* act in a governmental capacity. *Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589, 594 (Tex. App.—Austin 1991, writ denied) (citing *Braun v. Trustees of Victoria Indep. Sch. Dist.*, 114 S.W.2d 947, 950 (Tex. Civ. App.— San Antonio 1938, writ ref'd)), *overruled on other grounds by Fed. Sign v. Tex. S. Univ.*, 951

S.W.2d 401 (Tex. 1997), *and superseded by statute on other grounds as stated in Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).[10] Plaintiffs do not dispute the contention that independent school districts can only act in a governmental capacity, and are therefore immune from estoppel claims. Rather, Plaintiffs argue that their claim fits within the rule's exceptions.

A first exception allows promissory estoppel claims against government bodies where justice requires and where doing so would not interfere with the exercise of its governmental functions. *See Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 888 (Tex. 1990); *Prasifka*, 450 S.W.2d at 836. "[S]uch doctrine is applied with caution and only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice." *Prasifka*, 450 S.W.2d at 836. Plaintiffs argue that permitting estoppel in this case is proper because GRG was "absolutely deprived of the contractual right even to seek to be awarded work based on the refusal to pay illegal bribes to Marshall." Pls.' Resp. at 157.  Second, Plaintiffs argue that *Bowman* provides another exception: the presence of a contract, and because there was a contract in this case, Plaintiffs argue that promissory estoppel is appropriate. *Id.* at 156-57.

Plaintiffs' argument with respect to both alleged exceptions reveals that Plaintiffs' promissory estoppel claim really is intended to hold HISD to a reading of the JOC contract which guarantees or promises that GRG would be assigned JOC jobs and that its JOC contract would be renewed. Plaintiffs explain that, "HISD expressly or impliedly promised GRG would

---

[10] However, there is also Texas authority casting some doubt on this proposition. At least two courts of appeals have noted persuasive arguments against it, but neither resolved the question because each ultimately found that the school district's activity at issue was unquestionably a governmental function. *See McManus v. Anahuac Indep. Sch. Dist.*, 667 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.] 1984, no writ); *Galveston Indep. Sch. Dist. v. Clear Lake Rehab. Hosp., L.L.C.*, 324 S.W.3d 802, 807-09 (Tex. App.—Houston [14th Dist.] 2010, no writ). This Court finds itself in a similar position; it is irrelevant whether school districts may perform proprietary functions because providing for the maintenance and upkeep of educational facilities, the activity at the core of this dispute, without question goes to the heart of a school district's state constitution-mandated mission. *See Braun*, 114 S.W.2d at 950; Tex. Const. art. VII, § 1. This, however, does not resolve Plaintiffs' arguments about the exceptions to this rule.

have a fair shot at being awarded projects and having the contract renewed, which was not the case after Ramirez and GRG refused to pay bribes to Marshall." Pls.' Resp. at 158. However, according to well-settled Texas law, promissory estoppel claims lie only in the *absence* of a contract. *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App.—El Paso 2007, pet denied) ("If, however, a valid contract between the parties covers the alleged promise, the plaintiff cannot recover for the promise under promissory estoppel.") (citing *El Paso Healthcare Sys., Ltd. v. Piping Rock Corp.*, 939 S.W.2d 695, 699 (Tex. App.—El Paso 1997, writ denied); *Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)). Here, the JOC contract expressly addresses both project assignment and contract renewal, leaving both to HISD's sole and complete discretion. Plaintiffs cannot circumvent these provisions of the contract through a promissory estoppel claim.

Quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (internal citation omitted) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765–66 (Tex. App.—Texarkana 1992, writ denied).

Just like Plaintiffs' promissory estoppel claim, this claim too seeks to import guarantees of job assignments and contract renewal into GRG's JOC contract. Plaintiffs allege that HISD's decisions regarding JOC job assignments and contract renewal "were not consistent with HISD's former action in promising GRG it had the right fairly to seek JOC individual projects and a

renewed contract, which right was denied based solely on GRG's refusal to satisfy the precondition to enjoying the promised right of bribing Marshall." Pls.' Resp. 159. Plaintiffs' claim amounts to the assertion that the only way either the JOC job assignment or contract renewal processes can be shown to be "fair" is if GRG receives more JOC jobs or its contract is renewed. Plaintiffs have produced no evidence that HISD ever officially promised it more jobs or that its contract would be renewed; the facts reveal that HISD did not take inconsistent positions, it merely acted according to the JOC contract. Summary judgment is warranted as to both of the estoppel and quasi-estoppel claims.

### 3. Civil Conspiracy Claim

Finally, Plaintiffs bring a civil conspiracy claim against HISD and several of the other defendants. As discussed above, *see* Section II.B, he exact nature of this claim is confusing. In their Fourth Amended Complaint, Plaintiffs plead the elements necessary for a Texas state law civil conspiracy tort claim, but in their Response, they treat it both as a conspiracy to violate Plaintiffs' civil rights under 42 U.S.C. § 1983 and as a broader conspiracy that encompasses the state law tort claims. *See* FAC ¶¶ 169-74; *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); Pls.' Resp. at 159-161, 197-98. Whether they are arguing a conspiracy to violate Section 1983, or conspiracy as a state tort claim, according to long-settled law, the Court must dismiss this claim as to HISD.

First, because the Court has granted summary judgment as to all of the Section 1983 claims, there are no longer any such claims remaining in the case. Since "[a] § 1983 conspiracy claim is not actionable without an actual violation of § 1983," a civil conspiracy based on the underlying Section 1983 claims in this case can no longer stand. *Leachman v. Dretke*, 261 S.W.3d 297, 313 (Tex. App.—Fort Worth 2008, no pet.). *See Owens v. Bd. of Regents of T.S.U.*,

953 F. Supp. 781, 791 (S.D. Tex. 1996) (citing *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *receded from on other grounds by Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276-78 (5th Cir. 1992)). Second, the TTCA bars state tort claims brought against a school district, "[e]xcept as to motor vehicles." Tex. Civ. Prac. & Rem. Code §§ 101.051, 101.021. In Texas, civil conspiracy is a common law intentional tort. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 933–34 (Tex. 1983). As this conspiracy in no way relates to motor vehicles, the claim is barred. *See Brackens v. Dallas Indep. Sch. Dist.*, 3:09-CV-0642-D, 2010 WL 5464823, at *9-*10 (N.D. Tex. Sept. 20, 2010), *report and recommendation adopted*, 3:09-CV-0642-D, 2010 WL 5485886 (N.D. Tex. Dec. 30, 2010). Thus, under any theory, summary judgment is appropriate as to the civil conspiracy claim against HISD.

### E.  State Law Claims against the Marshall Defendants, Clay, and JM Clay

Though Plaintiffs originally brought civil conspiracy, tortious interference with an existing contract, and tortious interference with a prospective contract state law tort claims against Marshall, those claims have been dismissed. *See supra* Section II.B. There are no remaining state law claims against Marshall. The civil conspiracy and tortious interference with an existing contract claims against Clay and JM Clay are still pending.[11] Plaintiffs brought none of their state law tort claims against M Associates.

Under Texas law, a plaintiff must establish the following elements to succeed on a tortious interference with existing contract claim: (1) the existence of a contract, (2) willful and intentional interference (3) that proximately causes damage, and (4) actual damage or loss. *M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 774 (S.D. Tex. 2010); *Butnaru v. Ford Motor Co.*, 84 S.W.3d

---

[11] Because civil conspiracy depends on the existence of an underlying claim, the Court will hold its ruling regarding the civil conspiracy claims in reserve until all of the underlying claims have been resolved. *See, e.g.*, *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.").

43

198, 207 (Tex. 2002). "A plaintiff alleging tortious interference with contract must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its contract obligations." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 674–75 (S.D. Tex. 2010) (citing *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.,* 17 S.W.3d 721, 730 (Tex. App.—Austin 2000, pet. denied); *Davis v. HydPro, Inc.,* 839 S.W.2d 137, 139–40 (Tex. App.—Eastland 1992, writ denied); *Dunn v. Calahan,* No. 03–05–00426–CV, 2008 WL 5264886, at *3 (Tex. App.—Austin Dec. 17, 2008, pet. denied) (mem. op.)). "The plaintiff must present evidence that a contract provision was breached." *Id.* (citing *N.Y. Life Ins. Co. v. Miller,* 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.)); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.,* 992 S.W.2d 665, 667–68 (Tex. App.—Texarkana 1999, pet. denied).

The Court has already dealt with identical allegations regarding other defendants in this case. *See* Doc. Nos. 179, 229. For the same reasons that the Court dismissed those allegations, the Court will grant summary judgment regarding this claim. Plaintiffs have not shown that any provision of their JOC contract was breached. Without such evidence, this claim must fail, no matter whom it is brought against. Summary judgment regarding this claim is granted as to Clay and JM Clay.

### F. Objections to Summary Judgment Evidence

HISD and all of the Marshall Defendants have filed Objections to Plaintiffs' Summary Judgment Evidence (Doc. No. 277), and a Motion to Exclude Expert Witness (Doc. No. 272). Defendants Marshall and HISD have filed a Joint Motion to Exclude Expert Testimony of Kenneth Wilson (Doc. No. 275). In addition to Kenneth Wilson's testimony, in their motions, Defendants challenge the testimony of T. Ransom Cornish, another expert witness for Plaintiffs. Defendants object to the testimony of both experts as unnecessary, unreliable, and including

improper legal argument. Defendants also challenge the admissibility of the Ramirez Affidavit, the Medford-Dolcefino Recording, the affidavit and testimony of Steven Pottinger, parts of the Saavedra Deposition, and the Deposition of Elneita Hutchins-Taylor, Volume II, Aug. 12, 2013 ("Hutchins-Taylor Deposition"; Doc. No. 265-196). Defendants object to this evidence on a number of grounds, but largely challenge what they characterize as inadmissible hearsay, testimony lacking personal knowledge, and speculative and conclusory testimony. The Court need not resolve these objections and motions, however, because, as the Court has demonstrated, even if the objected-to evidence is considered, summary judgment is warranted. Accordingly, these objections are moot.

## IV.   CONCLUSION

For the reasons stated in this memorandum, Defendants' summary judgment motions are both **GRANTED**. HISD's motion to dismiss Plaintiffs' state law tort claims against Marshall pursuant to the TTCA is **GRANTED**, and its motion to dismiss the RICO Act claims is **DENIED AS MOOT**. The Marshall Defendants and HISD's Motion to Exclude Expert Witness (Doc. No. 272) and Objections to Plaintiffs' Summary Judgment Evidence (Doc. No. 277), along with Marshall and HISD's Joint Motion to Exclude Expert Testimony of Kenneth Wilson (Doc. No. 275) are all **DENIED AS MOOT** as well. Because the Court has determined that Plaintiffs lack standing to bring their RICO Act claims, the pending RICO Act claims against all remaining Defendants are **DISMISSED**. With none of the underlying claims against HISD remaining, Plaintiffs' requests for declaratory and injunctive relief are **DENIED**.

Thus, apart from any civil conspiracy claims, the only claims remaining in this case are the tortious interference with prospective contract claims against Defendants Jackson, RHJ, FBM, and Medford. Based on the voluminous evidence already before it, the Court believes that

there may very well be no genuine issues of material fact regarding whether Plaintiffs can satisfy the elements of the tort, including that these defendants intended to interfere with GRG's JOC contract. *See Bradford v. Vento*, 48 S.W.3d 749, 756-58 (Tex. 2001). Accordingly, the Court is prepared to consider summary judgment as to these claims as well. However, none of these defendants has moved for summary judgment. Consequently, Plaintiffs have until November 22, 2013, to submit additional briefing on this matter. Any additional briefing is limited to the tortious interference with prospective contract claims regarding Defendants Jackson, RHJ, FBM, and Medford alone, and is limited to ten (10) pages. Defendants Jackson, RHJ, FBM, and Medford then have until November 25, 2013, to submit any response, which is limited to five (5) pages, though no response is necessary.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the eighteenth day of November, 2013.

KEITH P. ELLISON
UNITED STATES DISTRICT COURT JUDGE