**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THE GIL RAMIREZ GROUP, L.L.C. | § | |
| and GIL RAMIREZ, JR., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION 4:10-CV-04872 |
| | § | |
| HOUSTON INDEPENDENT SCHOOL | § | JURY REQUESTED |
| DISTRICT, LAWRENCE MARSHALL, | § | |
| EVA JACKSON and RHJ-JOC, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM & ORDER ON DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

This case involves multiple claims for relief based on an alleged bribery scheme to procure construction contracts. In 2010, Plaintiffs Gil Ramirez Jr. and The Gil Ramirez Group, LLC[1] ("GRG") filed this action against Houston Independent School District ("HISD" or "the District"), former trustee Lawrence Marshall and his consulting company, alleged coconspirator Joyce Moss Clay and her consulting company, and two of GRG's competitors and their respective owners. After six years of litigation, this Court held a 14-day jury trial, in which the jury issued a verdict for Plaintiff, awarding actual and exemplary damages.[2] The Defendants request that the Court overturn the jury's verdict as a matter of law or, alternatively, grant a new

---

[1] Both Mr. Ramirez and The Gil Ramirez Group, LLC, originally filed this lawsuit. The jury charge (Doc. No. 480 at 3) defines the Plaintiff as the Gil Ramirez Group, LLC, only. The Court uses "Plaintiff" and "GRG" interchangeably throughout its Memorandum & Order.

[2] The Court entered a final judgment (Doc. No. 500), which ordered that GRG shall recover $676,667.00 in actual damages from all Defendants, jointly and severally. The Court also ordered that GRG shall recover in exemplary/punitive damages: $1,400,000.00 from Lawrence Marshall; $500,000.00 against Joyce Moss Clay and JM Clay and Associates; $500,000.00 against David "Pete" Medford, Fort Bend Mechanical, Ltd. and FBM Management, LLC; and $1,000,000.00 against Eva Jackson and RHJ-JOC.

trial. (Doc. Nos. 504, 505 and 516.) The Court finds that either form of relief would be inappropriate and contrary to law.

## I.    BACKGROUND

The Fifth Circuit ably described the factual background of this case, and the Court need not repeat it in detail. *See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 404–08 (5th Cir. 2015).

The alleged bribery scheme at the heart of this action concerns HISD's job-order contract ("JOC") program, through which HISD procures some of its construction and facilities services. The HISD Board of Trustees receives recommendations regarding vendors, and the Board then votes on whether to offer JOC contracts to the suggested vendors. GRG was selected as a JOC vendor in 2008 but not in 2010. Mr. Ramirez, the owner of GRG, alleges that he and his company were punished for refusing to participate in the corruption scheme of Lawrence Marshall, former president of the HISD Board of Trustees. GRG alleges in particular a pay-to-play scheme in which: potential and selected JOC vendors hired Joyce Moss Clay and her company, JM Clay and Associates as a consultant; Ms. Clay then paid Mr. Marshall a portion of the consulting fee; and Mr. Marshall provided favorable treatment to those who hired Ms. Clay. Defendants RHJ-JOC ("RHJ") and Fort Bend Mechanical ("FBM"), two companies competing for and ultimately awarded JOC contracts, hired Ms. Clay. Plaintiff contends that Mr. Ramirez's refusal to participate in this scheme harmed GRG's business, both in the reduction in assignments under the 2008 JOC contract, and in GRG's nonselection as vendor for the 2010 JOC program.

In 2010, Plaintiff brought an array of federal and state law claims against the defendants named above. After rulings by both this Court and the Fifth Circuit, the remaining defendants

are: Lawrence Marshall and his consulting company ("Marshall Defendants"); Joyce Moss Clay and JM Clay and Associates ("Clay Defendants"); FBM and its owner David "Pete" Medford ("Medford Defendants"); and RHJ and its owner Eva Jackson ("Jackson Defendants"). The claims include: (1) violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; and (2) state law claims for tortious interference with prospective business relations and civil conspiracy.

In October and November 2016, this Court held a 14-day trial that included live and deposition testimony from 28 witnesses. The jury found Defendants liable for tortious interference with prospective business relations, civil conspiracy, and RICO violations, and awarded actual and exemplary damages. (Doc. No. 480.)

Pending before the Court are Defendant Lawrence Marshall's Renewed Motion for Judgement as a Matter of Law and, alternatively, Motion for a New Trial ("motion" or "Defendants' motion") (Doc. No. 505); the Clay Defendants' motion to join Mr. Marshall's motion (Doc. No. 504); and the Medford Defendants' motion to join Mr. Marshall's motion (Doc. No. 516).

## II.    MOTION FOR JOINDER

Mr. Marshall timely filed his motion on February 23, 2017. That same day, the Clay Defendants filed a notice of joinder to Mr. Marshall's motion. (Doc. No. 504.) The Medford Defendants filed a notice of joinder to Mr. Marshall's motion on March 28, 2017. (Doc. No. 516.) Plaintiff argues that the Clay and Medford Defendants failed to comply with the particularity requirements under Federal Rules of Civil Procedure 7 and 59. Plaintiff also points out that the Medford Defendants filed their notice of joinder late.

Plaintiff maintains that the Clay Defendants' motion for joinder lacks particularity because it does not specify the Clay Defendants' reasons for a new trial. *See* Fed. R. Civ. P. 7(b)(1)(B) ("motion must . . . state with particularity the grounds for seeking the order"). The Clay Defendants state only their intention to join Mr. Marshall's motion, and add that there was no evidence that Ms. Clay bribed anyone or committed illegal acts. (Doc. No. 504.) Appellate courts have found that co-appellants in criminal cases may adopt by reference a part of another's brief, but "the arguments must actually be transferable from the proponent's to the adopter's case." *United States v. Ramirez-Rivera*, 800 F.3d 1, 12 n.1 (1st Cir. 2015) (quoting *United States v. Brown,* 669 F.3d 10, 16 n.5 (1st Cir.2012)). Many of Mr. Marshall's arguments would be applicable to the Clay Defendants, but not all. The Court of Appeals for the D.C. Circuit has held that "adoption by reference is permitted only to the extent we can readily apply the proponent's arguments to the adopter's case," finding that purely legal arguments can readily be adopted whereas fact-specific ones cannot. *United States v. Straker*, 800 F.3d 570, 594 n.5 (D.C. Cir. 2015). The Court allows the Clay Defendants to adopt Mr. Marshall's *legal* arguments, and thus grants the Clay Defendants' motion to join Mr. Marshall's motion. (Doc. No. 504.)

Plaintiff objects to the Medford Defendants' motion for joinder on the basis of untimeliness. A motion filed under Rule 59 must be filed within 28 days from the entry of judgment. Fed. R. Civ. P. 59(b). The Court may not extend that deadline. Fed. R. Civ. P. 6(b)(2). *See also U.S. Leather, Inc. v. H & W P'ship*, 60 F.3d 222, 225 (5th Cir. 1995) ("The requirement that post-trial motions be filed within the relevant . . . period after entry of judgment is jurisdictional, and may not be extended by a waiver of the parties or by a rule of the district court."). Because the Medford Defendants filed their motion for joinder late, the Court lacks

jurisdiction over it and must deny the motion. (Doc. No. 516.) Despite this ruling, the Court will address arguments raised by Mr. Marshall that also affect the Medford Defendants.

## III. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

### A. Legal Standards

Under Federal Rule of Civil Procedure 50, a motion for judgment as a matter of law may be granted if a trial court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In ruling on the renewed motion for judgment as a matter of law, the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

Federal Rule of Civil Procedure 59 states that a court may, on motion, grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court may grant a new trial if it finds that the "verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (internal citations omitted). *See also Beckham v. La. Dock Co., L.L.C.,*124 Fed. Appx. 268, 270 (5th Cir.2005); *Vackar v. Sentry Supply Inc.*, No. CIV.A. H-12-3716, 2015 WL 338616, at *2 (S.D. Tex. Jan. 26, 2015). "[T]he burden of showing harmful error rests on the party seeking the new trial." *Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000). In determining whether to grant a motion for new trial, the court must view the evidence "in a light most favorable to the jury's verdict." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

## B. Evidence of Proximate Cause

Defendants first argue that that there is no evidence that their actions proximately caused any injury to Plaintiff. Specifically, they contend that the evidence does not show that Mr. Marshall influenced or interfered with: the addition of RHJ as a JOC participant in 2008; the decision not to renew the 2008 JOC vendor contracts, including Plaintiff's contract; or the decision not to select GRG as a JOC vendor in the 2010 procurement process. (Doc. No. 505 at 2-13.)

When a party moves for a new trial on evidentiary grounds, a new trial should not be granted unless "the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998). There is no legally sufficient evidentiary basis when "'the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict.'" *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 401 (5th Cir. 2000) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)).

Defendants point to many instances in the testimony when HISD administrators stated that they had no contact with Mr. Marshall about which contractors to consider or recommend. (*See* Eaglin Trial Tr. 2 at 36, 42-43; Lindsay Trial Tr. at 13-16, 33; Garrett Trial Tr. at 41; Marshall Trial Tr. at 90-91; Eastman Trial Tr. at 165-66; Grier Trial Tr. at 64-66, 111; Grier Deposition Tr. at 11-12, 18-19.) They also maintain that Mr. Marshall was one of several Board members, and his vote alone could not and did not change the outcome of any contract selection decision. Furthermore, GRG placed so low (10 out of 13) in the 2010 JOC procurement rankings that it was not close to renewing its contract, regardless of Mr. Marshall's conduct.

Plaintiff counters that Mr. Marshall had ample opportunity to exert pressure over administrators and other Board members. (*See* Abe Saavedra Deposition Tr. at 39-40; Watson Deposition Tr.; Pottinger Trial Tr. at 25; Marshall Trial Tr. at 155.) Plaintiff cites testimony suggesting that Mr. Marshall actually exerted that pressure: he asked administrators to help RHJ, facilitated RHJ's award of a 2008 JOC contract, and expected payments via Ms. Clay from JOC vendors who wanted jobs. (*See* Abe Saavedra Deposition Tr. at 39-40; Medford Recording Tr. at 63-64; Pottinger Trial Tr. at 25; Marshall Trial Tr. at 100; Ramirez Trial Tr. 1 at 241; Ramirez Trial Tr. 2 at 10, 12, 36.) Mr. Marshall—albeit along with other Board members—voted to approve certain JOC vendors, including firms that had hired Ms. Clay, and against the renewal of contracts with the vendors selected in 2008. (*See* Medford Trial Tr. at 120, 154-55.) Plaintiff also calls into question the validity of the rankings before the 2010 procurement process, as the criteria was largely subjective and easy to manipulate. (*See* Medford Recording Tr. at 81; Eaglin Trial Tr. 1 at 140; Kashani Trial Tr. at 12, 30, 91-92.) After considering all the evidence, the jury found Mr. Marshall liable on all the claims against him. To reach this verdict, the jury must have found that Mr. Marshall proximately caused Plaintiff's injuries, as required by the jury charge. (Doc. No. 480 at 12-13.)

A motion for a new trial should not be granted if the verdict is against "merely against the preponderance of the evidence." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004) (citing *Dahlen v. Gulf Crews, Inc.,* 281 F.3d 487, 497 (5th Cir.2002)). When there is an "abundance of fact and expert testimony on each side, the relative credibility of these witnesses must be important to the outcome of the case." *Beckham v. Louisiana Dock Co.,* 124 F. App'x 268, 272 (5th Cir. 2005) (citing *Polanco v. City of Austin,* 78 F.3d 968 (5th Cir.1996)). *See also Reeves v. Gen. Foods Corp.*, 682 F.2d 515, 519 (5th Cir. 1982) ("it is the

function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences and determine the credibility of witnesses"); *Martin v. Chesebrough-Pond's, Inc.*, 614 F.2d 498, 500 (5th Cir. 1980) (uphold jury's verdict if supported by rational basis); *Lowe v. Pate Stevedoring Co.*, 558 F.2d 769, 772 (5th Cir. 1977) (jury weighs conflicting evidence and inferences, and determines witness credibility); *Torrence v. Union Barge Line Corp.*, 408 F.2d 873, 875 (5th Cir. 1969) (same). The case law strongly encourages a court to defer to the findings of the jury.

That said, to prevail at trial, "it is not enough for the jury to disbelieve the defendant's testimony. Rather, the plaintiff must offer *clear and convincing affirmative proof to support a recovery.*" *Dollar v. Georgia-Pac. Corp.*, 59 F.3d 1242, 1995 WL 1242, at *2 (5th Cir. 1995) (citing *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989)) (emphasis in original). *See also United States v. Slone*, 601 F.2d 800, 804 (5th Cir. 1979). Plaintiff provided affirmative evidence to support the jury's finding of proximate cause, even if the Court or another fact finder might have reached a different verdict. The jury deliberated for two days, weighing the evidence of more than two dozen witnesses. The Court respects the jury's verdict.

### C. Tortious Interference With Prospective Business Relations

The jury found for Plaintiff and against all Defendants on the claim for tortious interference with prospective business relations (hereinafter "tortious interference"). (Doc. No. 480 at 15.) Defendants contest this finding as a matter of law, on two grounds. First, they argue that Plaintiff lacked the requisite foundation for a tortious interference claim because the contract that originally awarded a JOC bid to GRG in 2008 was invalid. Second, Plaintiff failed to exhaust all administrative remedies and was not exempted from the exhaustion requirement.

### 1. Validity and Relevance of the 2008 JOC Contract

Defendants argue that Plaintiff cannot prevail on a tortious interference claim because the 2008 JOC contract (awarded to GRG) was void, due to HISD's failure to comply with the Texas Education Code requirements in the 2008 JOC procurement process. Defendants' proposed jury charge included a question on whether the 2008 JOC contract was void, but the Court did not include such an instruction. (Doc. No. 473 at 33-34; Doc. No. 480.)

Plaintiff responds with several arguments. First, the Fifth Circuit found that the tortious interference claim could proceed even if the 2008 JOC contract was awarded for reasons other than the Texas Education Code criteria. Second, because the claim regards *prospective* business relations, it does not hinge on the validity of the 2008 JOC contract under state law. Third, the evidence at trial failed to establish that the 2008 JOC contract was void. (Doc. No. 519 at 8-11.)

The Court finds Plaintiff's second argument persuasive. Plaintiff maintains the validity of the contract is irrelevant because this claim regards interference with *prospective* business relations.

> "To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result."

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (internal citations omitted). *See also In re Burzynski*, 989 F.2d 733, 739 (5th Cir. 1993). Plaintiff points out that, unlike a claim for tortious interference with a contract, there is no element requiring the existence of a contract. *Cf. Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (first element is "a contract subject to interference").

It is clear that a tortious interference with a prospective contract claim does not require an existing contract. However, Defendants argue that Plaintiff could only obtain jobs based on the 2008 JOC contract; if that contract was void, then Plaintiff had no claim to any jobs stemming from it. Defendants cite *TXU Energy Retail Co. L.L.C. v. Fort Bend Indep. Sch. Dist.*, in which the Texas Supreme Court held that a contract was void because it violated the competitive bidding requirements under the Texas Education Code, and that a contractor could not enforce the waiver of immunity in the (now void) contract. 472 S.W.3d 462 (Tex. App.—Dallas 2015). The Court finds *TXU Energy* distinguishable because, in that case, the plaintiff wanted to enforce a term within the contract. Here, GRG needs to show only that it had a reasonable chance of entering the business relationship. The evidence at trial showed that it did have a chance. Although GRG was eligible for jobs only because of the 2008 JOC contract, Plaintiff never contended that it was entitled to any of those jobs. Even if that contract were later found void, during the 2008 contract window, GRG still had that reasonable expectation that it would receive jobs. Despite Defendants' well-reasoned arguments, the Court upholds the jury's finding that Defendants interfered with Plaintiff's prospective business relations.

### 2. Exhaustion of Remedies

Mr. Marshall next argues that Plaintiff cannot prevail on its state tort claim because GRG did not exhaust administrative remedies. The Texas Education Code § 22.0514 requires, prior to the filing of a lawsuit against a professional employee of a school district, exhaustion of the remedies provided by the school district. It is undisputed that Plaintiff did not exhaust administrative remedies before filing this suit against Mr. Marshall. The parties discuss three possible exceptions to the exhaustion requirement: when exhaustion would have been futile; when the acts challenged were outside the scope of employment; and when the acts were "clearly

illegal." *See Ogletree v. Glen Rose Indep. Sch. Dist.*, 314 S.W.3d 450, 454 (Tex. App.—Waco 2010) ("Futility is a recognized exception to the exhaustion of administrative remedies requirement."); *Melendez v. Houston Indep. Sch. Dist.*, 418 S.W.3d 701, 710 (Tex. App.—Houston [14th Dist.] 2013) (recognizing exception to exhaustion requirement for claims that involve parties acting outside the scope of their employment); *Texas Air Control Bd. v. Travis Cty.*, 502 S.W.2d 213, 216 (Tex. Civ. App.—Austin 1973) (principle of exhaustion of administrative remedies sometimes relaxed in cases where action is clearly illegal).

The Court did not present the jury with a question on whether exhaustion would have been futile. The parties disagree as to whether the evidence presented at trial could support such a finding. (Doc. No. 505 at 16-19; Doc. No. 519 at 12-17; Doc. No. 525 at 2-5.) This disagreement is irrelevant to the Court's holding, as the Court did not rely on Plaintiff's futility argument in determining that Plaintiff could proceed with its claim.

Instead, the Court holds that exhaustion was unnecessary because Mr. Marshall's conduct fell outside of the scope of his employment. The Fifth Circuit already determined that the conduct alleged against Mr. Marshall did not fall within the scope of his duties as a trustee. The Court of Appeals stated: "bribery and peddling influence are not within the scope of a trustee's duty. He was allegedly defiling his position and wholly outside the legitimate scope of a trustee's duties if he accepted bribes in exchange for advancing the interests of certain contractors." *Gil Ramirez*, 786 F.3d at 417.

Defendants argue that the Fifth Circuit erred in finding that Mr. Marshall's alleged conduct fell outside of the scope of his employment. They turn to *Laverie v. Wetherbe*, in which the Texas Supreme Court held that the scope of employment analysis "remains fundamentally objective" and that "subjective intent is [not] a necessary component of the scope-of-

employment analysis." 517 S.W.3d 748, 753 (Tex. 2017). The parties disagree on the proper interpretation of *Laverie*. According to Plaintiff, "*Laverie* merely stands for the proposition that where the alleged tortious acts fall entirely within an official's job duties, courts need not probe the employee's subjective intent to analyze whether the acts were within the scope of employment." (Doc. No. 525 at 6.) Defendants, on the other hand, argue that "because *Laverie* forbids inquiry into a governmental employee's subjective motivations, the fact that GRG alleges that Marshall's actions—including his official act of voting—are criminal is immaterial to the analysis of his entitlement to dismissal of his civil tort claim under Texas law." (Doc. No. 526 at 5.) According to Defendants, even if Mr. Marshall cast his vote in the shadow of a bribe, the act of voting fell within the scope of his duties.

The Court instructed the jury that, to find Mr. Marshall liable for tortious interference, it must find that he had committed an "official act." (Doc. No. 480 at 12.) To explain the term "official act," the jury instruction[3] quoted language from *McDonnell v. United States*, 136 S. Ct.

---

[3] The instruction states:

> According to the Supreme Court, an official act is a decision or action on a question, matter, cause, suit, proceeding or controversy. The question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is pending or may by law be brought before a public official. To qualify as an official act, the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. A public official is not required to actually make a decision or take an action on a question, matter, cause, suit, proceeding or controversy; it is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the "official act," so long as he agrees to do so. Setting up a

2355, 2358 (2016). Defendants conclude that, because the jury found that Mr. Marshall committed an official act, his conduct was "incident to, and squarely within, the scope of his duties as a trustee." (Doc. No. 526 at 4.) Given this, the exemption to the exhaustion requirement would not apply.

The Court rejects Defendants' argument because *Laverie* is distinguishable from this case. Unlike in *Laverie*, Mr. Marshall's conduct in question is not exclusively his vote—one of the possible "official actions" found by the jury—but also his other actions in the alleged pay-to-play scheme.[4] In contrast, the *Laverie* plaintiff based his defamation claim solely on Ms. Laverie's statements about him as a job applicant. The Texas Supreme Court held that Ms. Laverie's job duties as senior associate dean and member of university job search committee included sharing her knowledge about the plaintiff. Ms. Laverie's personal motivations for providing unfavorable information were irrelevant to the determination of whether or not she performed her duties. *See Laverie*, 517 S.W.3d at 754-55. Her statements, even if defamatory, were made entirely as part of her role on the university's search committee. Even more importantly, Ms. Laverie was not on the receiving end of a bribe, an act that would fall beyond the scope of her duties.

As in *Laverie*, other courts that have recognized immunity for public employees have found that all of the alleged tortious conduct fell within the scope of an employee's duties. *See, e.g., McFadden v. Olesky*, 517 S.W.3d 287 (Tex. App.—Austin 2017, pet. denied) (police

---

meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."
(Doc. No. 480 at 13.)

[4] The Court need not examine Mr. Marshall's subjective intent when casting his vote. The Court can assess that his alleged acceptance of bribes was objectively not "in furtherance of the employer's business, and for the accomplishment of the objective for which the employee was employed." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 578 (Tex. 2002).

officers acted within scope of employment when preparing arrest affidavit, even if information supplied was false). For example, in *Rosencrans v. Altschuler*, 161 S.W.3d 517 (Tex. App.—Eastland 2004), the court found that a school employee was immune from claims of assault—Mr. Altshuler had allegedly covered the plaintiff's mouth with his hand to prevent her from speaking during a business meeting. The court held that Mr. Altshuler's choice to silence his colleague in this way was incident to or within his scope of duties as a school district employee and involved discretion or judgment, as permitted by the Texas Education Code. *Id.* at 521. *Rosencrans* exemplifies an expansive reading of the "scope of employment," but it does not change the outcome of the instant case. No part of Mr. Marshall's acceptance of bribes is incidental to his duties as a trustee. Although Mr. Marshall's conduct includes at least one official act (voting) that falls within the scope of his duties, that act neither encompasses the entirety of his conduct, nor excuses his other actions. Because Mr. Marshall's conduct did not fall fully within the scope of his duties, Plaintiff is excused from exhaustion.

The parties also dispute whether the "clearly illegal" conduct exception applies to the exhaustion requirement. Defendants maintain that § 22.0514 of the Texas Education Code never allowed an exception for clearly illegal conduct, and, even if it did, *Lavarie* precludes any such exception. (Doc. No. 526 at 9.) Because the Court finds that Plaintiff is exempted from the exhaustion requirement on other grounds, it does not need to address this argument.

### 3. Professional Immunity

Defendants also contend that Mr. Marshall is entitled to professional immunity. The Texas Education Code § 22.0511(a) states: "A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of

the employee . . . ." Defendants make a nearly identical argument to the one discussed above: because the jury found that Mr. Marshall committed an "official act," he was necessarily acting incident to and/or within the scope of his duties. For the reasons addressed in the prior section, the Court rejects Defendants' logic. Mr. Marshall is not protected by professional immunity.

### D. Racketeer Influenced and Corrupt Organizations Act (RICO)

The jury found that two RICO enterprises existed between the Medford, Clay and Marshall Defendants (related to FBM) and the Jackson, Clay and Marshall Defendants (related to RHJ). (Doc. No. 480 at 33, 46.) The parties dispute both the interpretation of the legal elements of a RICO claim and whether the evidence at trial can support a factual finding that the Defendants violated RICO. Defendants argue that they should be granted judgment as a matter of law for all RICO claims on distinct grounds: Plaintiff was not entitled to any damages after the JOC contract expired in 2010; the Fifth Circuit had already dismissed all RICO claims related to FMB; there is no evidence to support a finding of RICO liability; the Court erred in its instruction concerning the RHJ enterprise; and the Court's instruction on bribery allowed the jury to find Mr. Marshall liable for constitutionally protected conduct. (Doc. No. 505 at 25-27.) The Court addresses each of these arguments.[5]

#### i. Time Period for Damages

The Court instructed the jury to consider two time periods for RICO damages: 2009 and January-May 2010. The jury awarded damages for both periods. (Doc. No. 480 at 52.) Defendants argue that the Court was incorrect to allow the jury to consider damages for any time after January 2010, when the 2008 JOC contract expired for all vendors other than RHJ. Plaintiff

---

[5] Plaintiff has elected to collect damages based solely on the tortious interference claim. The Court nonetheless finds it appropriate to address Defendants' challenges based on RICO.

counters that the relevant cutoff date is May 13, 2010, when GRG was not selected for the 2010 JOC program. The Court agrees with Plaintiff that May 2010 is the appropriate cutoff date. The 2010 JOC contract did not begin as soon as Plaintiff's contract expired in January, but rather several months later. Between January and May 2010, RHJ—whose JOC contract began and ended later than the other vendors'—alone received business through the JOC program. If there existed a coordinated effort to benefit RHJ, as the jury found, then those benefits continued until May 2010.

### ii. FBM as a RICO Defendant

Defendants insist that FMB should not have been a RICO defendant. Defendants believe this was the Fifth Circuit's intention, as the opinion never discussed FBM in the context of RICO. *See generally Gil Ramirez*, 786 F.3d 400. Defendants also argue that there is no factual support to find against the Medford Defendants for a RICO violation, as FBM performed less work than Plaintiff during the relevant damages time period.

The Court does not read any significance into the Fifth Circuit's choice not to mention FBM by name. The Court of Appeals characterized the possible RICO scheme as one in which Mr. Marshall used his influence to benefit contractors who paid bribes to him. The jury heard evidence that FBM participated in such a scheme. The Court finds that FBM was properly considered as a RICO defendant.

### iii. Satisfaction of RICO Elements: Enterprise in Fact

Defendants next argue that there is no evidence to support the jury's finding of RICO liability because there was neither an enterprise among, nor a pattern of predicate acts by, Defendants. This argument gives the Court great pause, not because of weak evidence against

Defendants but rather because of the high threshold that courts across the country have set in order to uphold a RICO conviction.

"Claims under RICO, 18 U.S.C. § 1962, have three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.' A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity. *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (citing *Abraham v. Singh,* 480 F.3d 351, 355 (5th Cir.2007)). *See also Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016); *Alpert v. Riley*, No. CIV.A. H-04-3774, 2011 WL 564031, at *7 (S.D. Tex. Feb. 8, 2011). "The predicate acts can be either state or federal crimes." *St. Germain v. Howard*, 556 F.3d at 263.

According to Plaintiff, the predicate acts were bribes paid to Mr. Marshall and the acts Marshall took in exchange for those bribes. (Doc. No. 519 at 23.) Deferring to the jury's finding that Defendants engaged in the predicate acts, the question is whether Defendants' conduct was continuous as a matter of law.

> 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241–42 (1989) (internal citations omitted) (emphasis in original). Additionally, continuity does not require unending activity—there may be "spurts of activity punctuated by periods of quiescence." *Boyle v. United States*, 556 U.S. 938, 948 (2009).

"Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of closed or open pattern continuity." *Alpert*, 2011 WL 564031, at *7 (citation omitted). The Seventh Circuit noted that "a one-time bribe to a corrupt public official is criminal and wrong, but without more it is not enough to prove a pattern of racketeering activity." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 831 (7th Cir. 2016). The Fifth Circuit has not announced a minimum length of time to establish continuity. The Court of Appeals found that committing mail and wire fraud on at least 31 separate occasions, over a five-month period, did not establish closed-end continuity. *Malvino v. Delluniversita*, 840 F.3d 223, 231–32 (5th Cir. 2016).

Case law reflects a high standard for continuity under RICO, as the statute's "goal is the "undermining of organized crime's influence upon legitimate businesses." *In re McCann*, 268 F. App'x 359, 367 (5th Cir. 2008) (quoting *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 165 (2001)). The schemes at issue in this case undermine legitimate business, albeit not of the scale of schemes for which the Fifth Circuit has previously found RICO violations. *See, e.g., Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007) (reversing dismissal of RICO claims when acts of recruiting, collecting fees, and obtaining fraudulent visas were part of a two-year scheme "to convince up to 200 or more Indian citizens to borrow thousands of dollars to travel to the United States only to find upon their arrival that things were not as they had been promised"); *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995) (upholding RICO conviction when elected

official received four-year-long payout as reimbursement for risk-free investment in media company).

The evidence presented at trial shows that payments to the Clay and Marshall Defendants began in or before 2008. (Clay Trial Tr. 1 at 13, 25; Clay Trial Tr. 2 at 9, 18; Marshall Trial Tr. at 129.) The jury found that Mr. Marshall conferred benefits on FBM and RHJ that endured until at least 2010. This conduct was long, frequent and open-ended enough to satisfy the continuity requirement, even if the time period is shorter and the scope is narrower than in some other RICO cases.

In addition to continuity, Plaintiff bears the burden of demonstrating an enterprise. "To establish an 'association in fact' enterprise under 18 U.S.C. § 1961(4) plaintiffs must show evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (citing *United States v. Turkette,* 452 U.S. 576, 583 (1981); *Shaffer v. Williams,* 794 F.2d 1030, 1032 (5th Cir.1986)). Mr. Marshall argues that there cannot be an enterprise because these Defendants have no entity separate and apart from their activity.

The Fifth Circuit has held: "An association-in-fact enterprise 'must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts.'" *Zastrow v. Houston Auto Imports Greenway Ltd.*, 789 F.3d 553, 562 (5th Cir. 2015) (quoting *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir. 1987)). A complaint that "alleges an enterprise created by the alleged racketeering activity itself . . . is obviously not sufficient to plead the existence of an enterprise separate and apart from the pattern of racketeering activity in which it engages." *Id.*

The Supreme Court has opined on the phrase "beyond that inherent in the pattern of racketeering activity in which it engages." *Boyle*, 556 U.S. at 946. The *Boyle* court explained that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* at 947 (citing *Turkette,* 452 U.S. at 583)). It also noted that "if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect . . . . [T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* at 947 (quoting *Turkette,* 452 U.S. at 583)).

The Court finds that the evidence presented in this case shows an enterprise. The evidence substantiating a pattern of racketeering activity heavily overlaps with the evidence showing an enterprise. However, the evidence also reflects an association beyond the predicate acts. The Clay and Marshall Defendants set up businesses and reported their income as legitimate. The record reflects that Mr. Medford and Ms. Jackson hired Ms. Clay for her consulting services; Mr. Marshall and Ms. Clay testified about the mentorship that he provided to her. (Clay Trial Tr. 1 at 31-32; Clay Trial Tr. 2 at 8-11; Marshall Trial Tr. at 11-13, 19, 143.) These relationships, even if they laid the foundation for a pay-to-play scheme, indicate an association beyond a single payment or vote.

The facts in this case are distinguishable from those in which the Court of Appeals did not find an enterprise. In *Zastrow*, the defendants—a car dealership and the company's lawyer— became a unit only because they allegedly coordinated to threaten and retaliate against the plaintiff after he testified in a lawsuit. 789 F.3d at 558. Similarly in *Whelan v. Winchester Prod. Co.*, the defendants were connected only through the purchase of a well bore, which was also

part of the alleged predicate act to fraudulently obtain mineral interests. 319 F.3d 225, 227 (5th Cir. 2003). In these cases, among others, the plaintiff did not allege any association among the defendants other than their conduct related to the RICO scheme. *See, e.g., Shaffer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986) (defendants' engagement in various aspects of petroleum industry and possible unspecified contractual relations among them was insufficient to show enterprise); *Atkinson v. Anadarko Bank & Tr. Co.*, 808 F.2d 438, 441 (5th Cir. 1987) (bank, holding company, and bank employees not an ongoing association apart from bank). In contrast, Plaintiff alleged and provided evidence of ongoing relationships between Defendants that included, but were not limited to, the predicate acts. The Court finds that this is sufficient to show a RICO enterprise.

### iv.     Instruction on Campaign Bribery

The Court included an instruction on bribery through a political contribution statute as one of the possible predicate acts. With respect to the Jackson-Clay-Marshall (RHJ) enterprise, the parties agree that this inclusion is in error, but disagree on whether it is reversible.

Defendants state they are entitled to judgment in their favor because the Court may not "instruct a jury on an issue of law on which there is no evidence." *See Ware v. Reed*, 709 F.2d 345, 352 (5th Cir. 1983). Plaintiff counters that there was significant evidence of non-campaign related payments from RHJ to Ms. Clay, and therefore the jury could and did base its finding of RICO liability on that evidence.

If the court errs in a legal instruction, it is reversible error. *See Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 742 (5th Cir. 1980) (when plaintiff asserts several theories of recovery and one is in error, court is "required to assume that the jury followed only the erroneous instruction"). However, when a court has submitted a charge that lacks factual support,

this is not reversible. The Fifth Circuit, interpreting Supreme Court precedent, found that that "the *Stromberg* rule [requiring reversal when one of possible bases for jury's verdict was unconstitutional] should be applied only when jurors have been left the option of relying on a *legally* inadequate theory, not a factually inadequate theory. Thus we will not reverse a verdict simply because the jury might have decided on a ground that was supported by insufficient evidence." *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992) (emphasis in original). The Supreme Court stated: "We are aware of [no context] in which we have set aside a general verdict because one of the possible bases of conviction was neither unconstitutional as in *Stromberg,* nor even illegal as in *Yates,* but merely unsupported by sufficient evidence." *Griffin v. United States*, 502 U.S. 46, 56 (1991).

The campaign bribery instruction is in error because it is unsupported by the facts, not because it is a legally inadequate theory. The jury, as long as it relied only on the evidence presented, could not have found that RHJ violated the campaign bribery statute. Thus, this instruction was not reversible error. The Court is nonetheless sympathetic to concerns about imprecise instructions and regrets its error, harmless or not.

### v.  Instruction on Bribery

Defendants argue that the RICO instruction is deficient because the Court did not provide the same definition of "official act" as it did in the instruction on tortious interference. Defendants contend that this lack of specificity enabled the jury to find Mr. Marshall liable for conduct that was in fact protected by *McDonnell v. United States*, 136 S. Ct. 2355 (2016). They cite *United States v. Silver*, No. 16-1615-CR, 2017 WL 2978386 (2d Cir. July 13, 2017), in which the Court of Appeals for the Second Circuit recently overturned a RICO conviction because the trial court provided instructions that did not conform to *McDonnell*. The instructions

in *Silver* are distinct from the instruction in this case. The *Silver* jury was informed that the defendant could be liable for "any action taken or to be taken under color of official authority." *Silver*, 2017 WL 2978386 at *13. This Court's RICO jury instruction, in contrast, allowed a finding of liability only if:

> "the Defendant intentionally or knowingly offered another or conferred on another or agreed to confer on another or solicited from another or accepted from another or agreed to accept from another any benefit as consideration for the recipient's decision or opinion or recommendation or vote or other exercise of discretion such as the exertion of pressure on colleagues as a public servant . . ."

(Doc. No. 480 at 30.) This instruction is narrower than the *Silver* instruction and is consistent with *McDonnell*. Although the Court could and perhaps should have provided further detail as to the types of conduct permitted by *McDonnell*, such detail was not necessary to properly instruct the jury on the bounds of legal and illegal conduct. When viewed in their entirety, the jury instructions could not have induced the jury to find Mr. Marshall liable for committing a predicate act that is legal. The Court upholds the jury's finding of liability under RICO. Again, however, the discussion is academic since Plaintiff has chosen to collect damages solely on grounds of tortious interference. *See* Footnote 5.

### E. Damages

#### i. Sufficiency of Evidence

Defendants contend that the evidence cannot support a finding of damages, under either RICO or state law claims. Defendants object to Mr. Cornish's certification as an expert witness and his testimony regarding Plaintiff's loss. Defendants argue that any damages award would be purely speculative, in light of the insufficient evidence presented.

Under Texas law, an injured party must "establish the amount of the loss by competent evidence with reasonable certainty. Quite simply, lost profit damages may not be based on

evidence that is speculative, uncertain, contingent, or hypothetical." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 483 (5th Cir. 2008) (internal citations omitted). The general rule that:

> "damages are not permitted which are remote and speculative in nature . . . serves to preclude recovery, however, only where the *fact* of damage is uncertain, *i.e.,* where the damage claimed is not the certain result of the wrong, not where the *amount* of damage alone is uncertain. . . . Thus, although to set a damage figure arbitrarily or through pure guesswork is impermissible, once the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages.

*Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 706 (S.D. Tex. 2013) (citing *Broan Mfg. Co., Inc. v. Associated Distribs., Inc.,* 923 F.2d 1232, 1235-36 (6th Cir.1991)).

"If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion." *Dresser-Rand*, 361 F.3d at 843. The Court should consider whether reasonable jurors could reach their conclusion, based on the evidence. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 880 (5th Cir. 2013). Mr. Cornish provided testimony regarding damages, using several different models, and Defendants cross examined him on his qualifications, methodology and findings. (Cornish Trial Tr.) The jury had an opportunity to disbelieve Mr. Cornish's testimony and conclusions, and the Court finds that the jury could have properly reached its damages award based on the evidence presented.

### ii. Instruction on Proportionate Responsibility

Defendants state that the Court committed reversible error by not submitting an instruction to the jury on Plaintiff's proportionate responsibility for the claim of tortious interference with prospective business relations. Under the Texas Civil Practices and Remedies Code § 33.001, a plaintiff may not recover damages if his percentage of responsibility is greater than 50 percent. The Act continues:

(a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:

    (1) each claimant;

    (2) each defendant;

    (3) each settling person; and

    (4) each responsible third party who has been designated under Section 33.004.

(b) This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.

Tex. Civ. Prac. & Rem. Code § 33.003.

Plaintiff argues that the lack of a proportionate responsibility instruction was not erroneous because there was insufficient evidence to support the notion that Plaintiff was responsible for its harm (loss of business). Plaintiff acknowledges that there was limited evidence about Plaintiff's "poor performance," but that this was presented in an attempt to show an alternative theory of causation for GRG's loss of jobs, not to show proportionate responsibility in an act of tortious interference. Plaintiff further argues that the exclusion was harmless because the jury would not have awarded damages to Plaintiff if it had credited Defendants' theory that poor performance was the cause in drop-off of work or non-renewal. (Doc. No. 519 at 30-31.)

An appellate court "will reverse if the trial court denies a proper submission of a settling person's proportionate responsibility, and the error probably caused the rendition of an improper judgment." *Janga v. Colombrito*, 358 S.W.3d 403, 413 (Tex. App.—Dallas 2011) (citing *MCI Sales & Serv., Inc. v. Hinton,* 272 S.W.3d 17, 43 (Tex. App.—Waco 2008)). To find reversible error, there must have been evidence to make submission of the actor's responsibility appropriate, and the failure to submit must have made a difference in the outcome.

The Court finds that there was not sufficient evidence to submit a proportionate responsibility instruction. The evidence concerning Plaintiff's poor performance—discussed only in Mr. Bailes' deposition testimony[6]—speaks to the issue of causation, not responsibility for tortious interference. To find against Defendants, the jury was required to find that they had proximately caused the drop off in GRG's business. (Doc. No. 480 at 13.) It would be illogical to instruct the jury that they could simultaneously find that Defendants and Plaintiff had interfered in Plaintiff's prospective business relations. Although Plaintiff could have been the cause of its own harm, it would not have caused that harm through tortious interference with its own business relations. An instruction on proportionate responsibility for damages related to this claim would have created unnecessary confusion.

Other language in the instruction made clear that the jury should not find against Defendants or award damages if GRG was responsible for its loss of business. The tortious interference instruction concludes: "if you find that Plaintiff would have experienced the same drop off in its work or would not have been selected as a contractor or awarded a contract for the 2010 JOC procurement regardless of the actions of the Defendants, you must find against Plaintiff on this issue." (Doc. No. 480 at 13-14.) If the jury found that Plaintiff's performance brought about the drop off in work, it should not have found that the proximate cause element was satisfied. Furthermore, in considering damages, the jury was allowed to calculate damages only for tortious interference based on "profits that Plaintiff lost as a natural, probable, and

---

[6] Defendants cite only witness Darryl Bailes' testimony when arguing that GRG was responsible for its own job losses. Mr. Bailes testified that GRG was tardy and somewhat irresponsible in terms of submitting proper paperwork, and that GRG performed poorly in a job to renovate a playground. (Bailes Trial Tr. 1 at 12; Bailes Trial Tr. 2 at 227-247.) Although the Court recognizes that this evidence could show poor performance by GRG, this testimony would affect whether Defendants proximately caused GRG's loss of business, not whether GRG was responsible for interference with its own business relations.

foreseeable consequence of the interference with the business relation." (Doc. 480 at 20.) Based on this instruction, the jury should not have awarded any damages for any losses that Plaintiff may have suffered from its own poor performance.

Appellate courts have repeatedly found harmful error for failing to include a proportionate responsibility instruction. Such cases usually involve the lack of a proportionate responsibility instruction regarding settling parties, or plaintiffs who were obviously responsible for their own injuries. *See, e.g., Smith v. Sewell*, 858 S.W.2d 350, 356 (Tex. 1993) (plaintiff injured due to his own intoxication); *Janga*, 358 S.W.3d at 413–14 (undisputed evidence of negligence by settling party); *Memphis, Inc. v. Coggswell*, No. 05-02-01876-CV, 2005 WL 1774973, at *3 (Tex. App.—Dallas July 28, 2005) (defendant and non-party both found to have caused proximate harm to plaintiff); *MCI Sales*, 272 S.W.3d at 42–43 (legally sufficient evidence to find settling party responsible); *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 576 (Tex. App.—Houston [1st Dist.] 2004) (no jury question submitted regarding settling co-defendant's responsibility). Unlike the cited cases, the instructions in the instant matter provided an opportunity for the jury to find that Plaintiff was responsible for the harm it suffered. Had the jury found Plaintiff responsible for *any* of its harm, it should not have made a finding for, or awarded damages to, Plaintiff.

The Court maintains that an instruction on proportionate responsibility would have been inappropriate based on the evidence presented, confusing to the jury, and redundant in light of the instruction provided. The jury's finding of damages for Plaintiff was not in error.

### iii.  Exemplary/Punitive Damages

The jury awarded to Plaintiff exemplary damages totaling $3,400,000.00 (and no more than $1,400,000.00 against any single Defendant, *see supra* n. 2). (Doc. No. 480 at 24-25.)

Defendants argue that the Court erred in including an instruction on exemplary damages because Plaintiff did not plead specific entitlement to exemplary damages in the live complaint.

To uphold an exemplary (also called punitive) damages award, the plaintiff must either "pray for punitive damages or allege malice or willful, wanton conduct." *AON Properties, Inc. v. Riveraine Corp.*, No. 14-96-00229-CV, 1999 WL 12739, at *20 (Tex. App.—Houston [14th Dist.] Jan. 14, 1999). Defendants maintain that Plaintiff never alleged such conduct, and thus did not put Defendants on notice that they were seeking punitive damages. Additionally, Defendants say that the Court erred by failing to include the following information in its instruction: the definitions of malice, gross negligence, and fraud; which factors properly to consider in awarding punitive damages; and that a finding of punitive damages must be unanimous. Finally, because Defendants insist that there was no evidence of actual damages, a finding of punitive damages exceeds the permissible four-to-one ratio. (Doc. No. 505 at 40-47.) *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("more than four times the amount of compensatory damages might be close to the line of constitutional impropriety").

Defendants raised only some of these arguments in their proposed jury instructions or in the jury charge conference. (Doc. No. 473; Charge Conference Tr. at 93) Mr. Marshall requested that no punitive damages instruction be submitted to the jury and specifically objected to allowing consideration of Defendants' financial resources. (Charge Conference Tr. at 92-93.) The Court removed only the language regarding Defendants' financial resources. As Defendants did not previously raise objections regarding the definitions, they have waived those arguments. *See* Fed. R. Civ. P. 51; *Taita Chem. Co. v. Westlake Styrene, LP*, 351 F.3d 663, 667 (5th Cir. 2003). Moreover, Plaintiff's complaint, which described an intentional and criminal bribery

scheme among the Defendants, suffices to allege of malicious, willful or wanton conduct.[7] (*See* Fourth Amended Complaint, Doc. No. 181.) Finally, as discussed above, the evidence supports the jury's finding of actual damages; thus the exemplary damages award is proportional to the actual damages amount. The Court upholds the jury's award for exemplary damages.

### F. Objections to Evidence

Defendants contend that the Court improperly allowed several pieces of evidence. The Court disagrees.

### i. Adverse Inference Instruction

Defendants object to the Court's instruction that the jury could make an adverse inference against Mr. Marshall because of witnesses Ricardo Aguierre's and Frankie Wong's partial invocations of the Fifth Amendment. (*See* Doc. No. 480 at 11.) Defendants believe the instruction was inappropriate because Plaintiff did not plead or prove that Mr. Aguirre or Mr. Wong participated in the alleged criminal enterprises. Defendants' argument is unsupported by case law. In *F.D.I.C. v. Fid. & Deposit Co. of Maryland,* 45 F.3d 969, 977 (5th Cir. 1995), the Fifth Circuit considered a case in which a non-party witness invoked the Fifth Amendment. The Court of Appeals explained that the "Fifth Amendment 'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them'" and a "non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree'" than a party's silence. *Id.* (quoting *Baxter v.*

---

[7] Plaintiff's Fourth Amended Complaint includes the specific allegation that Defendants "willfully and intentionally interfered with the contract so as to secure business for their own benefit." (Doc. No. 181. ¶ 163). Defendants argue that this line did not survive the Fifth Circuit's opinion, which dismissed Plaintiff's claim for tortious interference with an existing contract. Even if this line should not be considered, the Court finds that the complaint as a whole put Defendants on notice early in the litigation that Plaintiff was alleging willful and wanton conduct and would likely seek punitive damages.

*Palmigiano,* 425 U.S. 308, 318 (1976); *RAD Servs., Inc. v. Aetna Casualty & Sur. Co.,* 808 F.2d 271, 275 (3d Cir.1986)).

This Court's instruction tracks language upheld in *RAD Servs.*, and states that "you [the jury] may, but are not required to, infer that his testimony would have been unfavorable to the Defendants." (Doc. No. 480 at 11.) *See RAD Servs., Inc.,* 808 F.2d at 277 ("You may, but you need not, infer by such refusal that the answers would have been adverse to the plaintiff's interests."). The Court's instruction is consistent with precedent, and the Court did not err in informing the jury that it could but was not required to infer that these witnesses' testimony would have been unfavorable to Defendants.

### ii. Statement by Ricardo Aguirre

Defendants maintain that the Court allowed impermissible hearsay by allowing Mr. Ramirez to testify about his conversation with Mr. Aguierre. The Court finds that Mr. Ramirez's repetition of Mr. Aguierre's statement[8] is admissible on two grounds. First, it is a statement against interest under Fed. R. Evid. 804(b)(3)(A) (statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary

---

[8] Mr. Ramirez's testimony includes the following statements:

> I was approached by Ricardo Aguirre that came to my office, met with myself and my father and told me that if I wanted to continue to get work with HISD I needed to pay Larry Marshall through his girlfriend, which was Joyce Moss-Clay, which he referred to as his bag lady. So I would pay Joyce Moss-Clay so she could pay Larry Marshall in order to continue to get work. . . .
>
> He showed me an invoice of how it works as far as an invoice that he was paying Joyce Moss-Clay. He also showed me a text from Larry Marshall that -- asking where is my check and he also communicated to me that he had seen a similar text because he had lunch with Alan Johnston and he received a similar text from Larry Marshall saying where is my money. . . .
>
> Mr. Aguirre showed me an invoice where he was paying Joyce Moss-Clay that would in turn pay Larry Marshall.

(Ramirez Trial Tr. 1 at 241-243.)

interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability"). This hearsay exception applies because Mr. Aguierre was unavailable. He was "absent from the trial or hearing and the statement's proponent [was not] able, by process or other reasonable means, to procure . . . the declarant's attendance or testimony." Fed. R. Evid. 804(a)(5)(B). Plaintiff presented excerpts of Mr. Aguierre's deposition testimony, but Mr. Aguierre did not testify at trial. Plaintiff was unable to serve a witness subpoena on Mr. Aguierre, despite numerous attempts by a process server to do so. (Black Trial Tr. at 4-7.)

The statement is also admissible under Rule 801(d)(2)(D) and (E). A statement is not hearsay when it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(D-E). Plaintiff argues, and the Court agrees, that Mr. Aguierre, at the time that he made this statement, was part of the pay-to-play scheme and was furthering Mr. Marshall's interests. Thus, he acted as an agent and coconspirator of Mr. Marshall. For both of the reasons discussed above, the statement is not hearsay and was properly presented to the jury.

### iii.  Expert Testimony by Ransom Cornish

Defendants object to Mr. Cornish as an expert and the admission of his testimony. Mr. Cornish is a certified public accountant and a lawyer. Most of his practice focuses on taxes, and he has conducted a number of audits of small businesses. He has been certified as an expert in state and federal court, providing testimony on calculations of monetary damages regarding claims of business' economic loss. (Cornish Trial Tr. at 1-22.) Although Mr. Cornish only once audited a construction company, and never a JOC contractor, the Court was correct to certify him

as an expert, as numerous other courts have. *See Wellogix*, 716 F.3d at 881–82 (expert witness does not need particular expertise in industry to help jury understand concepts and terms). Defendants questioned Mr. Cornish about his methodology, and the jury chose to credit his testimony. His certification as an expert and the admission of his testimony were not in error.

### G. Qualified Immunity

The jury also found that Mr. Marshall was not protected by qualified immunity. (Doc. No. 480 at 55.) Defendants dispute this finding because the law was not clearly established at the time of his conduct. According to Defendants, whether Mr. Marshall's conduct was illegal hinges on the difference between lawful influence and unlawful pressure, a distinction that courts across the country are now contemplating. *See, e.g., McDonnell*, 136 S. Ct. 2355; *United States v. Silver*, 2017 WL 2978386; *Ex parte Perry*, 483 S.W.3d 884 (Tex. Crim. App. 2016). Defendants argue that, because the law is developing even today, it could not have been clear to Mr. Marshall what conduct was illegal at the time he allegedly committed the acts in question. (Doc. No. 505 at 48-49.)

Plaintiff's theory of the case—which the jury appeared to accept—is that Mr. Marshall granted favors (including his vote to award JOC contracts) in exchange for a bribe.[9] *McDonnell* does not leave room for an official to vote in a certain way in exchange for a bribe. Such conduct cannot reasonably be viewed as a mistaken impression of the law. *See also Gil Ramirez*, 786 F.3d at 417 (finding Mr. Marshall ineligible for a professional immunity provision because of

---

[9] Mr. Marshall's conduct included but was not limited to his vote for JOC vendors. Plaintiff also presented evidence to suggest that Mr. Marshall could have pressured and perhaps did pressure HISD administrators to add a Board agenda item to vote on the addition of RHJ as a JOC contractor, and to withdraw an agenda item concerning the extension of JOC contracts for certain vendors, including GRG. (*See* Abe Saavedra Deposition Tr. at 41, 47; Eaglin Tr. 1 at 91; Pottinger Trial Tr. at 66, 83, 125.) This latter action falls closer to the bounds of activity possibly protected by *McDonnell*, 136 S. Ct. 2355.

clearly illegal conduct). The Court upholds the jury's verdict regarding the inapplicability of qualified immunity for Mr. Marshall.

## IV.    CONCLUSION

The Court recognizes the importance of these issues not only to the litigants but also to the public interest. The distinctions between protected and illegal conduct, as well as between proper and improper instructions to the jury, are of utmost importance. After long reflection, and with the assistance of excellent argumentation by all parties, the Court finds that the jury received legally correct instructions and reached a verdict supported by the evidence. The Court will not overturn that carefully deliberated verdict.

The Court **GRANTS** Ms. Clay's Motion for Joinder (Doc. No. 504), **DENIES** Mr. Medford's Motion for Joinder (Doc. No. 516), and **DENIES** Mr. Marshall's Motion for Judgement as a Matter of Law (Doc. No. 505). The Court will rule separately on Plaintiff's Motion for Attorney's Fees (Doc. No. 501).

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on the 31st of July, 2017.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE